660 F.2d 1096
 108 L.R.R.M. (BNA) 2145, 26 Fair
Empl.Prac.Cas. 1068,
26 Empl. Prac. Dec. P 32,068, 92 Lab.Cas. P 12,992
 Minnie FARMER, Hyardis Chambers, Shirley Wooton and Estate
of Frances Ratliff, Deceased, Plaintiffs-Appellees,
v.
ARA SERVICES, INC., Defendant,
Local 1064, United Catering, Bar and Hotel Workers,
R.W.D.S.U., AFL-CIO, Defendant-Appellant.
 No. 79-1295.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 10, 1980.
Decided Aug. 28, 1981.
Rehearing Denied Oct. 15, 1981.
 
 William Mazey, Rothe, Mazey, Mazey & Hamburger, Southfield, Mich., for defendant-appellant.
 John Runyan, Marston, Sachs, Nunn, Kates, Kadushin & O'Hare, Detroit, Mich., for plaintiffs-appellees.
 Before LIVELY and KEITH, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 KEITH, Circuit Judge.
 
 
 1
 Appellant Local 1064 United Catering Restaurant, Bar and Hotel Workers Union appeals from a judgment of the district court in which the union was found guilty of violating Sections 8(b) and 9(a) of the Labor-Management Relations Act of 1947, 29 U.S.C. §§ 158(b) and 159(a) ("LMRA") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). The Union alleges that the district court's findings of fact are clearly erroneous and that its conclusions of law are inconsistent with decisions of this circuit. For the reasons discussed below, we affirm the district court's factual findings on the liability issue. We also affirm the award of back pay and the award of damages for emotional and mental distress, but reverse the court's award of punitive damages.
 
 
 2
 * FACTS
 
 A.
 
 3
 This action was originally filed by Minnie Farmer, Hyardis Chambers, Shirley Wooton, and Sophie Troshal, on behalf of themselves and a class composed of all persons similarly situated.[1] The plaintiffs, white female employees of Automatic Retailers of America, Inc. ("ARA"), alleged that the company discriminated against them because of their sex by: (1) establishing a hiring, assignment, promotional and seniority system which limited the employment and promotional opportunities of women, and (2) negotiating collective bargaining agreements which provided grossly unequal wage rates to the sex-segregated classifications at ARA.[2] In addition to their claim against ARA, plaintiffs alleged that Local 1064 breached its duty of fair representation by: (1) negotiating labor contracts which maintained and perpetuated the sexually-discriminatory practices complained of, and (2) failing to represent the plaintiffs in grievance procedures brought pursuant to those agreements. Finally, the plaintiffs complained of harassment and retaliation by Local 1064 and sought injunctive and declaratory as well as monetary relief.
 
 
 4
 Before 1958, food services at Great Lakes Steel were provided by thirteen company-owned cafeterias. The cafeterias were located throughout the company's three downriver facilities and were staffed by a predominantly female work force. Increasing automation of food service at Great Lakes Steel Company began in 1958 when vending machines dispensing coffee and cold drinks were first installed at the plant. In 1960, the transition to automated vending service continued with the replacement on a trial basis, of one of the cafeterias by vending machine service only. In 1961, ARA, a vending and food service operation, took over the food service operation, and at that time, all of the cafeterias were replaced by vending services. In 1962, the Collective Bargaining Agreement between ARA and Local 1064 established several new job classifications which are at issue in this case. Those job classifications were: (1) "vending machine serviceman",[3] (2) "vending machine attendant",[4] and (3) "vending machine repairman".[5]
 
 
 5
 The type of work allocated to the various classifications, the job descriptions, wage rates, and step increases for each have all been subject to negotiation with Local 1064. The plaintiffs argue that the union has continuously thwarted their attempts to become repairmen and servicemen. They contend that the servicemen and repairmen perform work that is not significantly different from their own.[6] Since they perform substantially the same work, the plaintiffs contend that it is a violation of title VII both for ARA to pay disproportionately lower wages to the female attendant employees and for Local 1064 to participate in the establishment of the pay scales. They point to the Collective Bargaining Agreement which allows the employer to mix the responsibilities of the attendant and the serviceman as evidence of the similarity of the job responsibilities of each job classification.[7]
 
 
 6
 At trial, the defendants maintained that the required duties of servicemen and repairmen precluded the inclusion of female employees in those classifications. The evidence indicated that the duties of servicemen involved moving and assembling large machines, a task the union claimed females were incapable of performing. However, the evidence also indicated that after the transition to vending machine service was completed, servicemen performed little or no moving of machines. In fact several servicemen have never moved a machine, and at least one admitted that he was physically incapable of doing so.
 
 
 7
 It was not until 1969 that ARA promoted the first woman to the position of "serviceman". Until that promotion, the classification of "serviceman" was entirely male, while the classification of attendant was almost entirely female. After 1969, the "attendant" position remained virtually all female, and the "serviceman" position remained virtually all male. For example, in the "attendant" classification, females held all 23 positions in 1970, all 20 positions in 1974 and all 24 positions in 1967.
 
 
 8
 Attendants were paid considerably less than the position of serviceman.[8] Generally, attendants worked only a four-hour day with no overtime possibility while servicemen worked eight-hour days with the possibility of overtime pay. Thus, the serviceman positions were preferable in terms of both hourly wage and length of the work day.
 
 B.
 
 9
 Although class certification was denied by the district court, the individual plaintiffs, four former attendants at ARA, were successful in their claims of unfair representation against Local 1064.
 
 
 10
 Plaintiff Hyardis Chambers was employed by Great Lakes in 1949. She held top seniority in the bargaining unit when the serviceman's classification was created. Chambers claimed that the union and the company conspired to establish contract provisions in January 1970 which operated to terminate her.[9] Chambers filed several complaints through the grievance procedures established by the union which were not acted upon as required under the Collective Bargaining Agreement.[10] She was terminated in 1970, because she had been on sick leave for more than two years.[11] The district court found that Local 1064 had failed to fairly process Chambers' grievances.
 
 
 11
 Plaintiff Minnie Farmer was employed by the company in March 1968. She began training as a serviceman in January 1969. She performed satisfactorily as a serviceman for two weeks, but was then disqualified from continued participation as a serviceman trainee because of her inability to move a vending machine. At trial, Farmer argued that she was required to move machines that the company normally would require two men to move. Farmer was reinstated as a serviceman as a result of the intervention of the Michigan Civil Rights Commission, but later chose to bid into a position as a truck driver, an intermediate position between that of attendant and serviceman. Farmer had also filed several complaints with the Union Grievance Board.[12] The district court found that Farmer had indeed been required to perform tasks not required of all servicemen and that the union had not adequately processed her grievances concerning the serviceman position.
 
 
 12
 The third complainant, Shirley Wooton, came to the Company in November 1966, and bid on an announced vending service position in October 1969. Initially, Wooton was not allowed to bid for the position but later she was allowed to train as a serviceman. However, she was not permitted to move permanently into that classification, and eventually had to take a position as a janitor/truck driver. She claims that she did not get the serviceman position because of sex discrimination.
 
 
 13
 The fourth complainant, Frances Ratliff, was employed by the Company in August 1969 as a truck driver. In December 1969, she began training for a serviceman position, but did not complete the training because she believed that she was expected to perform work previously assigned to more than one person.[13] She signed a waiver of rights to further training. In May 1971, Ratliff notified the Company of her desire to rescind the waiver and to be reconsidered for the vending service work.
 
 
 14
 The employer refused to allow Ratliff to rescind the waiver and bid for a serviceman position that was vacant. Instead, the employer awarded the vending job to a male college student hired "off the street." Ratliff filed a grievance with the union on June 4, 1971, protesting the action which was denied by the employer and simultaneously withdrawn by the Union without Ratliff's consent.
 
 II
 
 15
 Local 1064 was the exclusive representative of the non-supervisory employees of ARA. As such, the union is required by Sections 8(b) and 9(a) to represent the plaintiffs "fairly and impartially" and to "make an honest effort to serve the interests of all ... members without hostility to any." Humphrey v. Moore, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964); Ford Motor Company v. Huffman, 345 U.S. 330, 337-38, 73 S.Ct. 681, 685-86, 97 L.Ed. 1048 (1953); Wallace Corp. v. NLRB, 323 U.S. 248, 255, 65 S.Ct. 238, 241, 89 L.Ed. 216 (1944). The union was not required to represent each member of the bargaining unit to his or her complete satisfaction on every grievance. See e. g., Ruzicka, 523 F.2d 306, 309-10; rehearing den., 528 F.2d 912 (6th Cir. 1975) (Ruzicka I). However, to fulfill its duty, the union must have not only enforced the provisions of the collective bargaining agreement in a non-discriminatory manner, it must have also fairly represented all segments of the bargaining unit during the negotiation of each collective bargaining agreement. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976). A union fails to fairly and impartially represent all members of a bargaining unit, and thus breaches its duty of fair representation, when the union's conduct toward any member becomes arbitrary, discriminatory or in bad faith. Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 71 L.Ed.2d 842 (1967); Ford Motor Company v. Huffman, supra, 345 U.S. at 338, 73 S.Ct. at 686; Ruzicka I, supra at 309-10.
 
 
 16
 Bad faith[14] or fraud is not a necessary element of a charge of unfair representation if the union's conduct is otherwise arbitrary or perfunctory. Vaca v. Sipes, 386 U.S. at 177, 87 S.Ct. at 909; Ruzicka I, supra. Arbitrary perfunctory union conduct which exhibits something more than simple negligence is a breach of the duty of fair representation. See Ruzicka v. General Motors, 649 F.2d 1207 at 1212 (6th Cir. 1981) (Ruzicka II). A union is not liable for mere errors in judgment if they were made honestly and in good faith. See Motor Coach Employees v. Lockridge, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971). Illustrations of the type of union conduct which constitutes unfair representation include both the perfunctory treatment of a "non-grievance", Williams v. Teamsters Local Union No. 984, 625 F.2d 138 (6th Cir. 1980), and inept handling of a grievance resulting from a union's ignorance of the relevant provisions of the employment contract. See Milstead v. International Brotherhood of Teamsters, 580 F.2d 232 (6th Cir. 1978). "Unexplained union inaction" which substantially prejudices a member's grievance may be sufficiently arbitrary to constitute unfair representation. See Ruzicka II, supra, at 1211. Ruzicka I, supra.
 
 
 17
 The district court found that Local 1064 arbitrarily failed and/or refused to arbitrate and compromise plaintiffs' legitimate grievances arising under the collective bargaining agreement.[15] Unless this court concludes that the findings of the district court are clearly erroneous, the union's perfunctory handling of plaintiffs' grievances is unfair representation under our holding in Ruzicka. As indicated below, we do not believe that the lower court's findings of fact are clearly erroneous; therefore, the district court was correct in concluding that the union breached its duty of fair representation.
 
 
 18
 In addition to its failure to arbitrate claims, Local 1064 breached its duty of fair representation by negotiating and entering into collective bargaining agreements, the provisions of which either were not adequately explained to the membership prior to ratification or which varied from the terms as explained. The district court found that Local 1064 had (1) negotiated an agreement which resulted in transfers between job classifications which perpetuated the sexually discriminatory hiring and assignment patterns for which ARA was initially responsible; (2) relegated the vast majority of female employees to the fewer-hour, lower-paying classification of attendant while males were competing for higherpaying jobs which have longer work weeks; (3) compensated women at a lower rate than men for comparable work; and (4) provided substantial step increases and raises in hourly rates for the virtually all-male classifications and smaller increases, and in some instances none, to the traditionally female classifications. The court below also found that contracts including the sexually discriminatory provisions were ratified even though more than one of the plaintiffs refused to sign resulting collective bargaining agreements as a member of the negotiating committee. In fact, a majority of the union's membership voted in favor of contractual demands which were precisely the reverse of those negotiated on three successive occasions.
 
 
 19
 Local 1064 contends that these findings by the district court are clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 869 (1948). See also Calage v. University of Tennessee, 544 F.2d 297 (6th Cir. 1976); Smith v. South Central Bell Telephone Co., 518 F.2d 68 (6th Cir. 1974); Fed.R.Civ.P. 52(a). After a careful review of the massive transcript and the thorough lower court opinion in this case, we believe that the district court's findings of fact are not clearly erroneous.
 
 
 20
 Having accepted Judge Thornton's findings of fact, we are led inescapably to the conclusion that the union's negotiation processes and the substance of the resulting collective bargaining agreements during the relevant years more than adequately support the district court's ultimate finding that Local 1064 breached its duty of fair representation by failing to represent the interests of the plaintiffs during negotiation sessions. See Vaca v. Sipes, supra 386 U.S. at 177, 87 S.Ct. at 909; Goodin v. Clinchfield R. R., 229 F.2d 578 (6th Cir.), cert. denied, 351 U.S. 953, 76 S.Ct. 850, 100 L.Ed. 1476 (1956); Barton Brands, Ltd. v. NLRB, 529 F.2d 793, 798-800 (7th Cir. 1976). The conduct which resulted in the union's breach of its duty of fair representation under Sections 8(b) and 9(a) also makes out a Title VII violation. The union is prohibited under Title VII from discriminating against any individual with regard to employment opportunities because of his or her race, color, religion, sex or national origin or from causing or attempting to cause any employer to discriminate against an individual on the above-enumerated bases. McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 284-85, 96 S.Ct. 2574, 2580-81, 49 L.Ed.2d 493 (1976); EEOC v. Detroit Edison Co., 515 F.2d 301, 314 (6th Cir. 1975), vacated and remanded on other grounds, sub nom., Utility Workers Union v. EEOC, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977). A labor organization can be held jointly and severally liable under Title VII for acquiescing in the discriminatory practices of the employer. McDonald v. Santa Fe Trail Transportation Co., supra; EEOC v. Detroit Edison Co., supra.
 
 
 21
 A union's role as a joint participant in the negotiation of a collective bargaining agreement has been found sufficient to render it liable under Title VII where the contractual provisions were discriminatory in operation or perpetuated the effects of past discrimination. Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Head v. Timken Roller Bearing Co., 486 F.2d 870, 875 (6th Cir. 1973); International Brotherhood of Teamsters v. United States, 431 U.S. 324, 348 n.30, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977). In fact, it is almost axiomatic that a union's breach of the duty of fair representation also subjects it to liability under Title VII if the breach can be shown to be because of the complainant's race, color, religion, sex, or national origin.
 
 
 22
 Therefore, Judge Thornton applied the correct legal standards, see Orr v. MacNeil & Son, Inc., 511 F.2d 166 (5th Cir. 1975), cert. denied, 432 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1976), and because we find none of its findings of fact to be clearly erroneous, the ultimate finding of liability must be affirmed by this court.III
 
 
 23
 On this appeal, Local 1064 attacks the jurisdiction of the district court to hear the claim. The union argues that Chambers and Wooton failed to file timely charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The record shows that Chambers lodged a charge of discrimination with the EEOC naming the union as respondent on May 25, 1970, less than 90 days following the last act of discrimination which Chambers alleged occurred on March 16, 1970. A complaint is timely filed with the EEOC if filed within 180 days after the last act of discrimination allegedly occurred. 42 U.S.C. § 2000e-5(e); Electrical Workers v. Robbins & Myers, Inc., 429 U.S. 229, 236-40, 97 S.Ct. 441, 446-49, 50 L.Ed.2d 427 (1976) affirming in relevant part Guy v. Robbins & Myers, Inc.; 525 F.2d 124 (6th Cir. 1975); Geromette v. General Motors Corp., 609 F.2d 1200 (6th Cir. 1979), cert. denied, 446 U.S. 985, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980). Less than 30 days after the Commission's issuance of a right to sue letter, Chambers joined the other original plaintiffs in filing this action against the employer and the union. Wooton also received and acted in a timely manner upon the Notice of Right to Sue letter issued by the EEOC with respect to her charge.
 
 
 24
 The union contends that Wooton filed no charges with the Michigan Department of Civil Rights. It is clear Wooton did not file a complaint with the Michigan Department of Civil Rights naming the union as a respondent; however, proceedings were instituted there on her behalf as a result of a charge received by the EEOC. This procedure is in accordance with the practice approved by the Supreme Court. Love v. Pullman Co., Inc., 404 U.S. 522, 525, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972). See also EEOC v. Bailey Company, Inc., 563 F.2d 439 (6th Cir. 1977), cert. denied, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506 (1978).
 
 
 25
 The union also asserts that the scope of the plaintiffs' Title VII claim in the lower court exceeded their administrative complaints before the EEOC. The union argues that Wooton's EEOC charge made no complaint that any provision of the bargaining agreement was discriminatory as to her, nor that she was discriminated against because of differences in wage scales. The union asserts similar arguments with respect to Chambers and Ratliff. The rule in this circuit is that the complaint and the judicial proceedings are limited not to the words of the EEOC charge but to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination. EEOC v. McCall Printing Co., 633 F.2d 1232 (6th Cir. 1980); EEOC v. The Bailey Company, supra, and cases cited therein. The exact wording of the charge of discrimination need not "presage with literary exactitude the judicial pleadings which may follow." Tipler v. E. I. duPont deNemours and Co., 443 F.2d 125, 131 (6th Cir. 1971), quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 465 (5th Cir. 1970). There can be no dispute that the plaintiffs' charge that they were denied representation in attempting to secure jobs as servicemen would reasonably have led the EEOC to investigate collective bargaining provisions subsequently challenged in federal district court. Moreover, one of the claims implicit in the charges of both Plaintiffs Wooton and Ratliff, is that they were indeed qualified by virtue of their past experiences as vending machine attendants or truck drivers to perform the responsibilities of the serviceman classification. An investigation of the attendant classification and its responsibilities in comparison with that of the serviceman classification would have led to the equal pay claims which the plaintiffs have plead more explicitly in their federal court complaint. Given the fact that an EEOC Right to Sue letter is to be liberally construed, see EEOC v. McCall Printing Co., supra, it is our opinion that the plaintiffs' Title VII claims are within the scope of the EEOC's investigation and could reasonably be expected to have grown out of their respective administrative complaints. Therefore, the plaintiffs' Title VII claims before the district court did not exceed the scope of their administrative complaints.
 
 
 26
 The union's third jurisdictional argument is that Section 301 of the LMRA 29 U.S.C. § 185, does not provide an appropriate basis for federal court jurisdiction over the plaintiffs' fair representation claims. However, the union's argument has no support in case law. See, e. g., Hill v. Iron Workers Local Union No. 25, 520 F.2d 40 (6th Cir. 1975); Smith v. Sheet Metal Workers, Local 25, 500 F.2d 741 (5th Cir. 1974); Rockford Redi-Mix Company, Inc. v. Zipp, 632 F.2d 30 (7th Cir. 1980), cert. denied sub nom., Countryman v. Zipp, 450 U.S. 929, 101 S.Ct. 1388, 67 L.Ed.2d 362 (1981). These cases recognize that an exclusive bargaining agent's duty of fair representation arises not out of a collective bargaining agreement but out of Sections 8(b) and 9(a) of the LMRA. Thus, the statutory duty to represent fairly the interest of each employee in dealing with the employer arises both before and after the execution of a collective bargaining agreement.
 
 
 27
 Finally, the union argues that the district court should not have exercised jurisdiction over the plaintiffs' fair representation claims because they failed to exhaust their internal union remedies. The district court clearly adhered to the general rule that an employee's fair representation claims traditionally cannot be entertained unless he or she has first exhausted the remedies provided by the collective bargaining agreement. Clayton v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, --- U.S. ----, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981); Glover v. St. Louis-San Francisco Ry. Co., 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969); Bshara v. Eltra Corp., 394 F.2d 502 (6th Cir. 1968). But a well-settled exception to the general rule of exhaustion of remedies is the principle that an individual will not be required to go through meaningless grievance procedures where it is clear that such procedures are biased against the complainant. Clayton v. International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America, supra; Glover v. St. Louis-San Francisco Ry. Co., supra; Ramsey v. Signal Delivery Service, Inc., 631 F.2d 1210 (5th Cir. 1980); Varra v. Dillon Companies, Inc., 615 F.2d 1315 (10th Cir. 1980); Hayes v. New England Millwork Distributors, Inc., 602 F.2d 15 (1st Cir. 1979). The district court concluded that: (1) the plaintiffs had unsuccessfully pursued the internal union procedure on at least two occasions; (2) the plaintiffs' failure to exhaust the remedies provided by the union constitution and bylaws was at least attributable to the union's lack of support on previous occasions; and (3) the available internal union remedies were not suited to redress the plaintiffs' fair representation claims. We agree with the district court that the plaintiffs established the futility of going through the union grievance machinery. Therefore, the district court properly concluded that federal court jurisdiction could not be attacked because of a failure to exhaust remedies provided under the collective bargaining agreement.
 
 
 28
 Accordingly, we hold that the district court did have jurisdiction to hear both the Title VII and Section 301 claims of the plaintiffs.
 
 IV
 
 29
 Local 1064 asserts that the district court's award of punitive damages and its award of damages for mental and emotional distress under Sections 8(b) and 9(a) were inappropriate.
 
 
 30
 We first conclude that the award of punitive damages must be reversed in light of the Supreme Court's recent decision in International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). In that case, the Court held that, "(b)ecause general labor policy disfavors punishment, and the adverse consequences of punitive damage awards could be substantial, we hold that such damages may not be assessed against a union that breaches its duty of fair representation by failing properly to pursue a grievance." Id. at 52, 99 S.Ct. at 2128. See also, Vaca v. Sipes, supra; Ford Motor Co. v. Huffman, supra.[16] Electrical Workers involved a violation of the duty of fair representation under the Railway Labor Act. Nonetheless, we believe that the Supreme Court clearly indicated that its decision is equally applicable to claims brought under the National Labor Relations Act, as amended:
 
 
 31
 The duty of fair representation is also implicit in the National Labor Relations Act, 49 Stat. 449, as amended, 29 U.S.C. § 151 et seq., because that statute, like the Railway Labor Act, affords unions exclusive power to represent all employees of a bargaining unit ... (w)e express no view on the propriety of punitive awards in suits under the Landrum-Griffin Act. We are concerned here with judicially created remedies for a judicially implied cause of action. Id. at 46-7, nn. 8-9, 99 S.Ct. at 2125.
 
 
 32
 Local 1064 has erroneously argued that damages for emotional and mental distress were improperly awarded to the plaintiffs. Damages for emotional and mental distress may be awarded for the union's breach of its duty of fair representation. Jones v. Trans World Airlines, Inc., 495 F.2d 790, 798 (2d Cir. 1974); Richardson v. Communication Workers of America, 443 F.2d 974, 982 (8th Cir. 1971), cert. denied, 414 U.S. 818, 94 S.Ct. 38, 38 L.Ed.2d 58 (1973). Where, as in the present case, the union's breach of its statutory duty results also from its wrongful participation in the breach of contract or from the negotiation of discriminatory contractual provisions, then the union may be held jointly and severally liable with the employer or its liability for damages may be apportioned to the extent that it shares responsibility for the damage. Here, the district court offset plaintiffs' damages against Local 1064 by the amount each had received in settlement of her claims against the employer, so as to apportion damages between the employer and the union.
 
 
 33
 Local 1064 also argues that it is unclear from the district court opinion whether the court awarded emotional and mental distress damages under Sections 8(b) and 9(a) or under Title VII. It is true that compensatory damages other than back pay are never appropriate in an action under Title VII. Harrington v. Vandalia Butler Board of Education, 585 F.2d 192 (6th Cir. 1978), vacated and remanded on other grounds, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979); EEOC v. The Detroit Edison Company, 515 F.2d 301 (6th Cir. 1975), vacated and remanded on other grounds, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977). The district court's entire discussion of emotional and mental distress damages occurs in its "Duty of Fair Representation" subheading under "Conclusions of Law". The court only refers to cases in which damages were awarded for violations of Sections 8(b) and 9(a), not Title VII. We believe that there is no basis for the union's allegation that the district court opinion does not indicate under which statute it awarded the compensatory damages. Therefore, we reject Local 1064's claim that the damages may have been improperly awarded under Title VII.
 
 V
 
 34
 The district court's award of punitive damages under Sections 8(b) and 9(a) is reversed. The judgment is affirmed with regard to all remaining issues on this appeal.
 
 
 
 [1]
 Frances Ratliff and Betty Mayer were added as individual plaintiffs in the Third Amended Complaint. Plaintiff Sophie Troshel is not a party on this appeal. She elected not to pursue her claims against Local 1064 and the district court, sua sponte, dismissed her as a party-plaintiff on October 14, 1976. Plaintiff Frances Ratliff, now deceased, is represented by her estate. Plaintiff Betty Mayer was dismissed as a party by the district court on motion by Local 1064
 The plaintiffs' requests for class certification and jury trial were denied in an order to that effect entered by the district court on October 26, 1972. They do not seek review of the October 26 order on this appeal.
 
 
 [2]
 The original complaint named the employer, ARA, and Local 1064 as defendants, but ARA was dismissed as a party when it entered into a settlement agreement with the plaintiffs
 
 
 [3]
 Vending machine servicemen were the first employed by ARA in 1961. The Company made a decision in 1961-62 to consider only its male employees as applicants for selection and training for the newly-created vending serviceman classification. The men selected for this new job were trained in the assembly, operation, maintenance and servicing of vending machines. Initially, the vending servicemen performed extensive lifting and moving to set up the vending service operation. Following the transition from manual to vending service, the servicemen performed little, if any, lifting or moving during voluntary overtime. They each were assigned to a particular kind or kinds of vending machines (e. g., pastry, candy, cigarettes, etc.) and made the rounds by truck during his shift to replenish the machine(s) from stock which he had earlier left at the location(s). The servicemen's responsibilities also included pulling money from the machines and maintaining paperwork regarding the number of items dispensed and cash collected; making simple repairs and adjustments to coin mechanisms and performing routine maintenance such as sanitizing the coffee machines; and keeping the vending machines in general clean, polished and in sanitary condition. However, the amount of time consistently spent by servicemen performing each of these tasks varied widely and all were ancillary to their primary purpose of replenishing the machines
 The number of vending servicemen simultaneously employed by ARA within the Local 1064 bargaining unit varied somewhat during the period from 1962-1970, but averaged about eight. All were assigned to eight-hour per day shifts, a minimum of five days per week. Servicemen also commonly worked substantial amounts of overtime on their sixth and seventh days. During the period from 1965-1969, the serviceman's job actually posted for bid on a six-day per week schedule.
 
 
 [4]
 Along with the servicemen, vending machine attendants were also responsible for the replenishing of vending machines, as well as their maintenance, minor repair and adjustment, and for the care, cleanliness and general appearance of the machines and the areas where they were located. Vending attendants were assigned to a particular location within the plant rather than moving from location to location to service a single machine as the servicemen did. In addition, the nature of the work performed by attendants varied depending upon the location to which they were assigned. Those assigned to the four-hour shifts at Ford Motor Company after 1970 performed work unlike any of the others, and in fact did not service or attend vending machines at all. Rather, they were short-order cooks, preparing hamburgers and other grill items. Their classification title was changed to "Grill Cook" in the 1976 collective bargaining agreement to reflect the true nature of their responsibilities. The duties and responsibilities of the vending machine attendants assigned to the Hanna Mill and to the other Great Lakes Steel facilities were more similar. Those attendants serviced and replenished the entire bank of machines with vended items, syrup and paper supplies from a stock room located near or within the stand; they transported large quantities of food items and other supplies daily from the stock room to the machine by means of a cart or dolly. They often unpackaged and shelved deliveries from the commissary. They were also responsible for ordering sufficient quantities of change to fill the coin mechanisms the following day; keeping those mechanisms filled and pulling and bagging money from the machines; and, finally, they assisted customers by providing change, making minor adjustments and repairs to machines where necessary and hand-selling items in the event of a major breakdown
 Vending attendants generally worked part-time, but again the shifts varied in length depending on the location.
 
 
 [5]
 Vending machine repairmen were responsible for major repairs to the vending machines. During the period from 1962 to 1970 there was generally one repairman assigned to each the day and afternoon shifts, six days per week, but none was assigned to the midnight shift
 
 
 [6]
 Although there are many similarities between the two positions, there are also obvious differences. For example, a vending service employee must drive a truck, but attendants are neither required to drive trucks nor to maintain and service the vehicles. The servicemen load products from the warehouse and bring them to the various vending facilities in the plants, but no attendant is required or allowed to load from the warehouse. In addition, the evidence indicated that servicemen, but not attendants, are responsible for inventory and for large sums of money
 
 
 [7]
 Because of the actual functions performed by the company's vending machine repairmen, servicemen and attendants, there was a great deal of overlap in the job responsibilities. In fact, the job description of each of these classifications expressly provided that the enumerated duties were not all-inclusive. Moreover, Local 1064 specifically acknowledged in each of the labor contracts that the company had the right to assign the workers to other duties because the nature and amount of work available made it impractical to confine employees exclusively to the primary duties of their respective classifications. Thus, the fact that only one or possibly two servicemen were assigned to the day shift inevitably resulted in day shift attendants spending a considerable amount of time adjusting and replenishing vending machines. Likewise, the fact that the pastry, all-purpose, candy and cigarette, and canned pop machines at Great Lakes locations other than at the Hanna facility are only replenished by vending servicemen once a day, necessarily means that those machines were replenished by vending attendants and mill drivers at all other times
 The fact that only one attendant and one serviceman was employed on the afternoon shifts, other than at Hanna and Ford, invariably meant that the afternoon driver would spend a large part of his shift replenishing machines. Finally, the employment of only one repairman per shift except for the midnight shift, where there were none, plainly dictated a choice to other vending service personnel between attempting machine adjustments and repairs, whatever their nature, or painstakingly hand-selling food from the machines to waiting customers.
 
 
 [8]
 The disparity in wages existed from the beginning of the operation of the company at Great Lakes Steel. The original hourly wage rates established effective January 21, 1962, for Vending Machine Repairmen, Servicemen and Attendants, respectively, were $2.35, $2.20 and $1.62. While the fifteen cent per hour differential between repairmen and servicemen remained constant with increases after 30, 60 and 90 days on the job, the hourly differential between servicemen and attendants was increased from 50 cents to 61 cents after sixty days and 66 cents after ninety days. In other words, while the contract guaranteed repairmen and servicemen an additional ten cents per hour after 30, 60 and 90 days, the attendant classification received a ten, seven and five cent increase for the same time periods
 
 
 [9]
 In January 1970, Local 1064 amended the Collective Bargaining Agreement to limit the period an employee can be on sick leave and still maintain seniority to two years
 
 
 [10]
 Chambers filed two grievances with the Union, one dated December 27, 1963, and one dated January 15, 1964, challenging the legality under the collective bargaining agreement the combination into a single job work that formerly had been performed by both vending machine attendants and servicemen. She also filed grievances in January 1966, July 1967, and May 1969
 
 
 [11]
 Chambers was on sick leave from March 18, 1968, until March 1970, which was more than the two year maximum established by the Collective Bargaining Agreement, as amended in January 1970
 
 
 [12]
 Farmer filed a grievance with the Union immediately after she was removed from training for a serviceman's job on January 30, 1969. The Union never acted satisfactorily on the grievance, and Farmer again requested that they arbitrate her claim. Although Local 1064 General Secretary Paul Domeny sent a written request to the employer on April 2, 1969, requesting arbitration, the grievance was never formally submitted to arbitration by the union
 
 
 [13]
 Ratliff successfully completed ten to fourteen days training for the position of serviceman, during which time she worked about two days each with approximately six incumbent vending servicemen. Upon her request to withdraw from the training program, the company indicated its desire that she sign a waiver relinquishing her right to any further vending service training
 
 
 [14]
 Bad faith will, of course, support a claim of unfair representation where the union has made a bad faith decision that the individual's grievance was without merit or in other appropriate circumstances. See Dill v. Greyhound Corp., 435 F.2d 231, 238 (6th Cir. 1970)
 
 
 [15]
 See infra, for an outline of the plaintiffs' factual contentions with regard to the processing of grievances by the Union. These contentions were accepted by the district court in its conclusions of fact
 
 
 [16]
 At oral argument, the plaintiffs conceded that Electrical Workers barred an award of punitive damages under Section 301