**Cheryl KELLNER, Plaintiff,**

v.

**GENERAL REFRACTORIES COMPANY, Defendant.**

**No. H 81–683.**

United States District Court, N.D. Indiana, Hammond Division.

March 3, 1986.

James Balanoff, Hammond, Ind., for plaintiff.

William T. Enslen, Hammond, Ind., Theron L. Marsh, II, Nancy L. Nesewich, Chicago, Ill., for defendant.

## FINDINGS AND ORDER

KANNE, District Judge.

Before the court is plaintiff's Civil Rights action based on (1) alleged discriminatory acts by defendant employer for its failure to promote plaintiff because of her sex; (2) alleged discriminatory acts of retaliation because of plaintiff's filing of a discrimination claim coupled with adverse acts of harassment intended to force her to resign. Jurisdiction is based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(c)(1), 2000e–3(a).

The plaintiff, Cheryl Kellner, is a white woman who began her employment with the defendant, General Refractories Company at its Gary, Indiana, facility in January of 1977. Her employment continued until her resignation in June of 1980.

In January of 1980, General Refractories Company appointed Barney Fowler, a black man, as plant manager of its Gary facility. Upon his arrival, Barney Fowler, instituted a number of personnel changes, including the decision to create the position of cost accountant.

The plaintiff sought to be promoted from accounts payable clerk to the new position of cost accountant. Although others were interviewed for the position, plaintiff was not. Ultimately an outsider, James Lebryk, was hired.

On May 1, 1980, plaintiff filed a claim with the Gary Human Relations Commission alleging sex discrimination based on

the denial of the promotion to cost accountant.

On May 30, 1980, plaintiff amended her claim with the Commission to include allegations that she was retaliated against for filing the initial discrimination claim. In her amended claim she also asserted various allegations of harassment including a transfer to switchboard operator.

Initially, the court will consider plaintiff's claim, in this action, that the decision to deny her a promotion to the position of cost accountant was based upon her sex. Secondly, the court will address plaintiff's claim of retaliatory discrimination and whether plaintiff was harassed on the job, to such a degree that she was forced to resign her position on June 21, 1980.

■ The burden of proving that the defendant intentionally discriminated against the plaintiff remains, at all times, with the plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), *Andre v. The Bendix Corporation*, 774 F.2d 786, 791–792 (7th Cir.1985). The rules governing the burdens of production and order of proof in a Title VII case alleging discriminatory treatment are complex, though not difficult to understand. The plaintiff begins her case with the burden of making out, by a preponderance of the evidence, a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093, *Andre*, at 792. After the plaintiff has established a *prima facie* case, the burden is on the defendant to produce evidence of a legitimate nondiscriminatory reason for the employee's termination. *Andre* at 792. This is not a burden of persuasion but rather a burden of production. If the defendant's evidence raises a genuine issue of fact, the presumption created by the plaintiff's *prima facie* showing drops from the case. The plaintiff then has the opportunity to show that the alleged reason was pretextual. The burden of showing pretext merges with the ultimate burden of showing that the defendant intentionally discriminated against the plaintiff. A plaintiff may succeed in this either directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Id. Coates v. Johnson & Johnson*, 756 F.2d 524, 531 (7th Cir.1985), *Parker v. Board of School Commissioners*, 729 F.2d 524, 526 (7th Cir.1984), *Nellis v. Brown County*, 722 F.2d 853, 856 (7th Cir.1983).

■ Turning now to the first issue, to establish a *prima facie* case of discriminatory denial of promotion based on sex, plaintiff must establish the following elements: (1) That plaintiff is female; (2) that a position to which plaintiff could be promoted was available; (3) that plaintiff was qualified for the position; (4) that plaintiff was denied the position; and (5) that the position was awarded to a less qualified male. In this case, elements one, two and four are not in dispute and are established.

■ As to element three, plaintiff produced several witnesses to attest to her qualifications including her former immediate accounting supervisor, Richard Agnew. Commencing September 1979, plaintiff handled accounts payable, compiled data for monthly statements, and used computer programs to show monthly indexes of efficiency. Plaintiff assisted Agnew by preparing invoices, payables, cross-invoices, and in "number crunching". Agnew testified he felt that plaintiff was a good employee, very versatile, efficient, responsible, and "for the most part" got along well with other employees. He also stated that he believed the plaintiff had more background and experience than Lebryk, the man hired for the cost accounting position.

However, on cross-examination Agnew stated that he did not believe plaintiff was turned down for the position of cost accountant because of her sex, but rather because of "her attitude". In particular, Agnew said that the plaintiff was forward, aggressive, and loud. Agnew further stated that Fowler was putting in his "own

cadre" and that was the reason Lebryk was hired.

In his testimony, Barney Fowler stated that when he first arrived at the Gary plant the place was out of control, beset with racial problems, and had the poorest profitability in the company's system of 10 plants. It is clear that Fowler was assigned the task of "shaping up" the Gary plant. Fowler was advised, through a conversation with William Edmonds, Production Manager, that the plaintiff harbored a racist attitude and was thought to be the cause of the racial strife at the plant.

As a result of his displeasure with the condition at the plant, Fowler made a number of employee changes in addition to the one at issue here. On March 3, 1980, Fowler transferred a male assistant from the position of plant manager to the position of a maintenance supply supervisor. The following week Fowler transferred a male production manager to the position of a production foreman. Fowler stated his reasons for transferring these two males were that neither had capacity to "turn around" the plant. Fowler removed a white female employee from her position in the front office and assigned her to a lab position in the plant. Although the plant position paid more the employee was not particularly satisfied with the move. This transfer was made with the purpose of moving someone with experience into the lab position.

Fowler established the position of cost accountant as the result of a specific request by Agnew, who stated that he needed more help. At some point before the hiring decision was made, Agnew recalls mentioning to Fowler that the plaintiff was interested in the position. He also recalled a conversation with Barney Fowler wherein Fowler complained to Agnew that the invoices prepared by the plaintiff were not satisfactory. Fowler was dissatisfied with plaintiff's work performance, in particular, "her lack of timeliness, orderliness in presenting those invoices registered to him for review." Fowler did not consider the plaintiff for the position, even though he

was aware of her interest. He stated, "she would not be an effective and willing cooperative member of the management team. and that her gender had nothing to do with his decision."

Both Lebryk and plaintiff were equally qualified educationally but neither held college degrees at that time. Both had previous accounting experience. Both were attending accounting courses on a part-time basis. Plaintiff had previously worked for the defendant company, Lebryk had not. Although Richard Agnew testified he believed plaintiff may have been more qualified than Lebryk with regard to her accounting ability he heavily qualified his assessment because of "her attitude."

The most telling fact, however, was that Barney Fowler had had previous experience in working with Jim Lebryk and Lebryk came recommended for the position

If, for the position in question, we assume that the sole criteria for job qualification was accounting proficiency, plaintiff could be said to have met that job qualification. If we also assume that the job was awarded to a less qualified male, then plaintiff would have established a *prima facie* case of sex discrimination.

Having made these assumptions we turn to the question of a legitimate nondiscriminatory reason for plaintiff's lack of promotion.

In general the nondiscriminatory reasons asserted by defendant for plaintiff's lack of promotion are dissatisfaction with her job performance and her attitude. The "front office" where plant manager Barney Fowler and the plaintiff worked was a small building having only a handful of administrative employees. It is hardly unreasonable in such a situation to require employees to be compatible with their fellow workers as well as their supervisors. Racial attitudes as well as other human relation factors which might bear on the efficiency of an office are of legitimate concern when filling the job position at issue here.

Fowler's conduct belies his statement that he neither believed nor disbelieved that plaintiff was a racist. There is a strong inference from the evidence that Fowler did in fact believe plaintiff to be a racist, even though the testimony is in conflict as to whether she was or was not. Rightly or wrongly Fowler disliked the plaintiff. He clearly manifested hostility toward her.

However, Barney Fowler actually believed that plaintiff would not be an effective, willing and cooperative member of the management team. That belief appears to have been based on several facts. After Fowler had taken over the plant, plaintiff called the former white plant manager to complain about her situation. Added to this was the loud and aggressive nature of the plaintiff. Fowler's decision not to promote the plaintiff was based on her perceived "attitude"—not her sex. As a new black plant manager facing an unproductive facility beset with racial strife, Fowler determined not to consider plaintiff for promotion. The real reasons for plaintiff's lack of promotion do not constitute sex discrimination.

Plaintiff has failed to prove the defendant's nonsexual discriminatory reasons were a pretext for the defendant's alleged sexual discriminatory act. Circuit Judge Frank Easterbrook, sitting by designation in this district, set forth the limits of Title VII in *Bohen v. City of East Chicago, Ind.*, 622 F.Supp. 1234, 1242 (D.C.Ind.1985):

> At all events Title VII does not require careful employment decisions. It does not establish merit selection in employment.

The nondiscriminatory reason for the failure to promote the plaintiff invalidates the assumption that she was qualified for the position in question. Plaintiff did not meet the legitimate job qualifications, which included her ability to get along with others, nor was the job awarded to a less qualified male. Plaintiff has thus failed to establish a *prima facie* case of discrimination because of her sex. *See Huhn v. Koehring Company*, 718 F.2d 239 (7th Cir.1983),

*Kephart v. Institute of Gas Technology*, 630 F.2d 1217 (7th Cir.1980).

The court now considers the second aspect of this case which is plaintiff's charge of retaliation for the filing of her discrimination claim. To establish a *prima facie* case of discriminatory retaliation in the form of harassment, plaintiff must establish the following elements: (1) That the plaintiff filed a charge of unlawful discrimination; (2) that the defendant took adverse action against plaintiff; and (3) that the adverse action was linked to the filing of the charge of unlawful discrimination. *See Gunther v. County of Washington*, 602 F.2d 882 (9th Cir.1979), *aff'd*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). Respective burdens of proof, persuasion, and production present in Title VII discrimination cases, also apply to retaliation claims.

Plaintiff has met the first aspect of the test in that she filed a charge of unlawful discrimination with the Gary Human Relations Commission on May 1, 1980. As to the second prong of the test, concerning adverse action or harassment directed against her by the defendant, plaintiff cites her transfer from an accounts payable clerk to switchboard operator together with other conduct by plant manager Barney Fowler. The additional acts including the demand that plaintiff agree to the release of her military files so Fowler could check her eligibility for certain benefits; the insistence that she produce a disability excuse in circumstances where other employees were not required to do so; the obstruction of plaintiff's tuition advance refund; repeated tossing of papers at her by another employee, Jeff Stevens; the refusal of Barney Fowler to address the plaintiff directly when in the same room; a reprimand for plaintiff's admitted insubordination to a supervisor named Steve Kertell; references to plaintiff's "rattlesnake personality" and Fowler's description of plaintiff as a "bitch"; a statement by Barney Fowler that if plaintiff was insubordinate to anyone she would be fired; and in regard to plaintiff's last paycheck, statements by Barney Fowler to another em-

ployee that plaintiff: "should get down on her hands and knees in order to get her check." To this is added a midnight call to plaintiff on Friday, June 20, 1980, from Lebryk (during plaintiff's vacation) demanding that she come to work the next day, Saturday, or be fired.

■ We will first examine plaintiff's transfer from her accounting position to switchboard operator. In plaintiff's amended charge of discrimination filed with the Commission on May 30, 1980, she alleged: "On May 14, 1980, around the same time Mr. Fowler plant manager received my charge, he informed me that my position will be changed to switchboard operator." Plaintiff also claims that Fowler told her: "When you assume the duties of switchboard operator, your rattlesnake personality better not come forth." In fact Fowler admits to referring to plaintiff's personality as being that of a "rattlesnake". Barney Fowler testified that he transferred plaintiff to switchboard operator at the same pay because: "There was nowhere else that I could really put her to cause me a minimal amount of problems."

Testimony of the plaintiff undercuts her assertion that Fowler knew of the sex discrimination charge and then transferred her to switchboard operator. The relevant testimony on this point is as follows:

MS. NESWICH:

Q *So you no longer believe that Barney Fowler knew about the charge when he transferred you?*

A *No.*

Q So, therefore, you no longer believe that he was retaliating against you by transferring you?

A Not retaliation, no,

Q It wasn't retaliation?

A No, it was something else.

(Emphasis added.) It is clear that plaintiff does not believe that Barney Fowler transferred her in retaliation for filing a charge of discrimination—"it was something else". The inference is that the "something else" was a personality conflict motivated in part by race.

The inferences as to the underlying basis for the personality conflict between the plaintiff and the defendant arises from several factors. These factors include the racist allegations made with regard to the plaintiff; plaintiff's loud and aggressive manner; and Fowler's abrasive management style which was described as abrupt, direct, and forceful, with criticism freely given. To these factors are added a new plant manager faced with an unproductive facility beset with racial unrest.

■ Based on the testimony, harassment appropriately describes most of the adverse acts which were visited upon plaintiff.

The credibility of Fowler is clearly called into question with regard to events which occurred after plaintiff filed her Civil Rights action. Fowler's denial that he ever stated to others that the plaintiff "should get down on her hands and knees in order to get her check" is not borne out by the testimony of other witnesses. Those comments were made by Fowler. Fowler admits that he made inquiry with regard to plaintiff's veteran's benefits and that he called the Veteran's Administration with regard to her. Fowler's requirement that plaintiff provide an excuse upon missing work appears to have singled her out among all the employees. Fowler admits obstructing plaintiff's tuition advance refund which was to be used by plaintiff to take additional accounting classes. Fowler denies ever tossing papers at plaintiff himself, but admits that he would not directly address the plaintiff and would only allow her to communicate with him through her supervisor. Contrary to his denials, there is corroborative evidence that Fowler did call the plaintiff a "bitch". Plaintiff was called by Lebryk at midnight on a Friday night and told to come to work on Saturday or be fired. Whether this call was authorized by Fowler is not clear. On balance it appears that it was less an act of harassment and more an act taken by an overworked and exasperated James Lebryk. Nevertheless, it is abundantly clear that

acts of harassment occurred and the second prong of the test is met.

The only issue is whether these acts were taken in retaliation for plaintiff's filing a charge of discrimination. In determining whether the adverse acts of harassment were linked to plaintiff's filing of the charge of unlawful discrimination the court will give weight only to those acts which occurred after it can be reasonably assumed that Fowler became aware of the initial filing of plaintiff's Civil Rights claim. Sometime prior to May 21, 1980, plaintiff had disclosed to her supervisor, Mr. Agnew, that she had filed a charge of sex discrimination.

 Discounting the transfer to switchboard operator and the late night telephone call, it has been established that life at General Refractories was made exceedingly difficult for the plaintiff after mid-May 1980. The plaintiff was clearly singled out for harassment. Plant manager Fowler did not like the plaintiff before she filed the initial Civil Rights claim. The clear inferences from the evidence show that after Fowler learned of that filing, his hostility toward the plaintiff increased. The filing of the sex discrimination claim was evidently the straw that broke the camel's back. Even in the out-of-the-way position as switchboard operator plaintiff was causing problems. Fowler then accelerated a course of conduct which would make plaintiff's working conditions so unpleasant that any reasonable person in her position would have felt compelled to resign. The plaintiff was constructively discharged on June 21, 1980. *See Scott v. OCE Industries, Inc.*, 536 F.Supp. 141, 148 (N.D.Ill. 1982).

It would not have been unplausible for defendant to assert that because of a personality conflict and, in a racially tense environment, Fowler felt that plaintiff was a cause of disruption in office operations and a source of race-related problems.

If the defendant had actually asserted that the true reason for forcing the termination of plaintiff was Fowler's intense dislike of her, and therefore the acts of har-

assment were not taken in retaliation for plaintiff's filing her initial Civil Rights complaint, the court would be in a position to deny plaintiff relief. *See Andre v. The Bendix Corporation*, 774 F.2d 786, 798 (7th Cir.1985) (An unfortunate and destructive conflict of personalities does not establish sexual discrimination.) *Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175, 182 (3rd Cir.1985). *Bohen v. City of East Chicago, Ind.*, 622 F.Supp. at 1242, (a decision regarding employment need not be right to be lawful; it is enough that the decision be the same one that would have been made if the employee had not filed a charge with the EEOC).

However, in this case defendant denies that plaintiff's resignation was the result of any conduct of the defendant in general, or Mr. Fowler in particular. Defendant has not acknowledged that the acts of harassment which reasonably caused plaintiff's resignation actually occurred, let alone that they were based on any nondiscriminatory reason. Failure of the defendant to acknowledge that the plaintiff was subjected to harassment eliminates the application of the principles set forth in *Johnson v. University of Wisconsin-Milwaukee*, 783 F.2d 59, 63–64 (7th Cir.1986), (where the evidence that defendant's true reason for terminating plaintiff was different than that asserted, but still nondiscriminatory, defendant has carried its burden). Here the defendant merely asserts that there is insufficient evidence to show that acts of harassment occurred. That conclusion is simply not to be drawn from the evidence.

 Plaintiff has carried her burden by establishing a *prima facie* case that: (1) she filed a charge of unlawful discrimination; (2) defendant took adverse action against her; (3) and the adverse action was linked to the filing of the charge of unlawful discrimination.

Defendant, on the other hand, has failed to carry its burden to affirmatively put forth evidence of any nondiscriminatory

reason for plaintiff's constructive discharge.

Plaintiff's *prima facie* case having been unrebutted, she is entitled to judgment in her favor on her claim that she was a victim of discriminatory retaliation for filing a Civil Rights claim.

Plaintiff is entitled to judgment in an amount equal to her annual salary from the date of her resignation on June 21, 1980, until plaintiff obtained other employment on June 27, 1983. This amount totals the sum of $35,770.00.

IT IS THEREFORE ORDERED that judgment be entered in favor of the plaintiff, Cheryl Kellner, and against the defendant, General Refractories Company, in the sum of $35,770.00, plus costs and reasonable attorney's fees.