Donna MARTIN, Appellant,

v.

LOCAL 1513 AND DISTRICT 118 OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Appellees.

No. 88–1120.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1988.

Decided Oct. 13, 1988.

Thomas Mann, Jr., Des Moines, Iowa, for appellant.

Arthur C. Hederg, Jr., Des Moines, Iowa, for appellees.

Before LAY, Chief Judge and BROWN,* Senior Circuit Judge, and HEANEY, Circuit Judge.

LAY, Chief Judge.

Donna Martin brought a suit against Local 1513 (Union) and District 118 of the International Association of Machinists and Aerospace Workers (IAMAW) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1965). After trial to the district court,[1] judgment was entered in favor of the Union. On appeal, Martin

---

* The HONORABLE JOHN R. BROWN, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

asserts that the trial court's findings were clearly erroneous. We affirm.

Martin filed this Title VII action against Local 1513,[2] alleging gender discrimination,[3] unfair representation, and retaliation.[4] The trial court found that Martin failed to carry her burden of proof to establish that Local 1513 discriminated against her. On appeal, Martin asserts that the trial court's factual findings were clearly erroneous under Fed.R.Civ.P. 52(a). We do not agree.

## I. GENDER DISCRIMINATION

Martin began working as a machine operator at Tension Envelope (Tension) in 1978. While so employed, she was a member of Local 1513 of the IAMAW. On July 8, 1981, Martin received notification from Tension that the company was unilaterally creating a new job classification, that of "restricted operator," and that she was being placed in this category effective immediately. A restricted operator was defined by Tension as an operator who had permanent or temporary disabilities. As such, they would be paid less than the traditional operators who were able to run all of the machines. In Martin's case, this meant a reduction of forty-five cents per hour.

2. It must be noted from the onset that Martin's employer, Tension Envelope, is not a named party defendant in this lawsuit. Rather, Martin's complaint was limited to the local and the district units of the IAMAW.

3. 42 U.S.C. § 2000e et seq. states, in part:
§ 2000e-2. Unlawful employment practices
(c) It shall be an unlawful employment practice for a labor organization—
(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

Within days of this announcement, Local 1513 was actively negotiating with Tension on the structure of this newly-proposed wage scale. Martin herself was a member of the Union's negotiating committee on this matter. Martin was opposed to the restricted operator classification because she felt it discriminated against women, since the majority of operators at Tension were women. Local 1513, on the other hand, favored the classification because without it persons like Martin would be left "out on the street."

Martin filed a formal grievance of this wage reduction. Not only did Local 1513 pursue arbitration on Martin's behalf, the record indicates Martin won her grievance and was awarded back-pay. In April of 1982, after the new collective bargaining agreement was in force, Martin again grieved about her reduced wages as a result of her restricted operator status. Local 1513 took this second grievance to arbitration on behalf of Martin and obtained a ruling that the company did not have a right to unilaterally create the restricted operators classification. Rather, the matter must be subject to negotiation like any other issue of the collective bargaining agreement.[5]

4. Section 2000e-3. Other unlawful employment practices
(a) It shall be an unlawful employment practice for * * * a labor organization to discriminate against any member thereof * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

5. Martin was fully experienced in the grievance procedure. The Union represented her on all grievances she filed. In addition to the grievance the Union pursued on the restricted operator classification, Martin pursued at least two other grievances against the company by Union representation.
In August, 1979, Martin was diagnosed as having tendonitis of the elbow and her doctor recommended that, although she could return to work, she was restricted from operating the "527 machine." Despite this recommendation, Martin was requested by Tension to operate the 527 machine the following November 14. Martin refused and went home. Tension treated

Martin contends that Local 1513 favored the restricted operator classification, and thus "helped to establish [a] discriminatory scheme" at Tension. We do not agree. To begin with, this theory turns on two assumptions. First, that the restricted operator status has been found to be discriminatory; and, second, that Local 1513's support of the classification was based solely on an intent to discriminate and not in pursuit of a legitimate union interest. Yet the district court specifically found that Martin failed to establish that the restricted operator classification was unlawful or that it was used by the company in a manner that discriminated against women employees. These findings are not clearly erroneous.

Perhaps even more fatal to Martin are the district court's findings of credibility on this issue. The court found very credible the testimony of Tension's attorney, Albert L. Harvey, concerning the company's tough stance with regard to the restricted operator classification and the Union's efforts to negotiate a more favorable agreement. The court found the testimony of Martin herself and other witnesses, who suggested that the Union was responsible for an atmosphere hostile to women both in the work place and in connection with union business and activities, not to be credible. From a careful review of the record, we cannot conclude that the district court was clearly erroneous in dismissing the gender discrimination claim.[6]

## II. UNFAIR REPRESENTATION

The second basis of Martin's complaint centered on a charge of unfair representation by Local 1513. On appeal, Martin asserts that the district court's findings were clearly erroneous. The district court found that the Union fairly represented the interests of all of its members and that it did not engage in arbitrary or discriminatory conduct adverse to Martin. Once again there is evidence to support the court's finding and we cannot find that it is clearly erroneous.

The gravamen of Martin's complaint relates to the fact that women are allegedly not allowed to be "adjusters" who fix the envelope machines at Tension. Women traditionally are "operators" who run the machines. The adjuster is paid more. It is claimed that Local 1513 agreed with Tension, at the time the collective bargaining agreement was negotiated, to maintain this division of gender classification.[7] As a result, Martin alleges that she did not apply for an adjuster's job because to do so would have been futile since Tension would not have allowed her to be so employed and, more relevantly, Local 1513 would not have supported her position.[8] She con-

---

this act as a voluntary resignation and would not permit her to return to work.

Martin filed a grievance of this job dismissal with Local 1513. On January 10, 1980, the grievance was voluntarily settled and Tension allowed Martin to return to work without any loss of seniority. This return was conditioned on the fact that Martin would not be required to operate the 527 machine in the future. However, because she could not fulfill all of the duties of a regular operator (e.g., she could not operate all of the machines), in January and March of 1981 Tension denied her wage progressions. Martin grieved these denials. Local 1513 processed these grievances in a timely fashion. They were approved and ready for arbitration when Martin again voluntarily settled with Tension on June 29, 1981.

6. In addition to the above claim of discrimination, Martin cites two examples of alleged sexual harassment directed towards her personally. However, Martin acknowledges that no grievances were filed on these alleged "sexual overtures" made by fellow union members nor were they brought to the attention of management of Tension.

Martin brought this suit individually and not as a class action. Therefore, although the district court allowed in evidence all acts towards Martin's fellow union members, this evidence was relevant only to establishing a pattern for discrimination or the intent to do same on the part of Local 1513.

7. Martin concedes that Tension dropped job classifications of "male" and "female" from the collective bargaining agreement after Title VII became law. Despite this fact, Martin contends that Tension continued to practice a de facto form of job channelling and she urges that the evidence shows Local 1513 was aware of this condition.

8. According to her claim:

During the twenty-seven year period between 1960 and 1987, only one woman was permitted to work as an "adjuster," and she

tends she lost income totalling $16,912.16 as a result of the unavailability of promotional opportunities.

Martin also alleges that despite being aware of the problems faced by female members, and that sex discrimination was a violation of the collective bargaining agreement, Local 1513 did not make a bargaining issue of Tension's alleged: (a) failure to promote women, (b) use of a verbal test to screen women out of promotions, (c) inclusion of a discriminatory provision on pregnancy in the bargaining agreement, and (d) failure to operate its plant in a way to protect the safety of its employees. She asserts, relying on *Romero v. Union Pac. R.R.*, 615 F.2d 1303 (10th Cir.1980), that "[i]f a union does not take action against discriminatory practices by an employer, it may be held responsible for those practices." *Id.* at 1310 (citation omitted). Additionally, "[a] union cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability for such discrimination." *Id.* at 1311.

We have difficulty with Martin's "acquiescence" argument in two respects. First, the theory of *Romero* turns on the fact that "[the] compan[y] [has committed] prohibited employment discrimination." *Id.* For whatever reason, the employer, Tension, was not made a party to this lawsuit. Therefore, the company's employment practices were not before the district court, nor are they at issue in this appeal. The simple fact is that in its current posture, this appeal focuses exclusively on the Union's activity.

■ The second difficulty we have with Martin's "liability by way of acquiescence" argument is that neither this circuit, nor the Supreme Court, has gone that far in holding a union liable under Title VII. In fact, recently in *Goodman v. Lukens Steel*

*Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed. 2d 572 (1987), the Supreme Court specifically chose not to address this issue. *Id.* at ——, 107 S.Ct. at 2623. The *Goodman* court felt that the district court's declaration, "that mere Union passivity in the face of employer discrimination renders the Union liable under Title VII," was a *"rather abstract observation." Id.* (emphasis added). While it is true that *Goodman* affirmed a finding of Title VII liability on the part of the unions, the Supreme Court took great pains to point out that both the district court and the Third Circuit had held that the case against the unions "was much stronger than one of mere acquiescence." *Id.* at ——, 107 S.Ct. at 2624. On the record before us, we do not have such evidence.

Martin further relies on *Farmer v. ARA Services, Inc.*, 660 F.2d 1096 (6th Cir.1981), which mandates that

[a] union fails to fairly and impartially represent all members of a bargaining unit, and thus breaches its duty of fair representation, when the union's conduct toward any member becomes arbitrary, discriminatory or in bad faith. [citations omitted]

\*    \*    \*    \*    \*    \*

[A] union's breach of the duty of fair representation also subjects it to liability under Title VII if the breach can be shown to be because of the complainant's race, color, religion, sex, or national origin.

*Id.* at 1103–04. While this court does not quarrel with the holding of *Farmer*, it is axiomatic that for Martin to succeed on this theory there must first be a finding that Local 1513 breached its duty of fair representation. On the record before us, such a contention is without merit.

---

was demoted from that position before the expiration of the 90–day probationary period. Women who applied for the position of "adjuster" were required to take a verbal test which was subjective in nature, and the oral answers given by female applicants were interpreted by Tension's managers so women routinely failed this test. Women employees of Tension came to understand that "operator" jobs were considered women's work, and

"adjuster" jobs were considered men's work. Some women who applied to be "adjusters" were told that they were not sufficiently mechanically inclined to be "adjusters" as they were brought up to do household work. Women came to understand that "adjuster" jobs were reserved for men, and because of that prevailing understanding, few women applied to be "adjusters."

Appellant's brief at 2–3.

The district court found that Local 1513 fairly represented all of its members and that it did not engage in arbitrary or discriminatory conduct towards Martin. These findings put Local 1513 in compliance with the mandate of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), on the duty of fair representation.

 As discussed earlier, the grievances Martin brought were handled properly by Local 1513. Although Martin sets out a list of some thirty alleged unfair representation violations involving other women members, she has failed to show that the Union unfairly represented her, personally, in any way. The mishandling of grievances of other members of Local 1513, if they occurred, do not establish that the Union unfairly represented her. On the basis of the record as a whole, we feel the district court's dismissal of the unfair representation claim is not clearly erroneous.

## III. RETALIATION

 Martin's final claim was that because she filed a complaint against Local 1513 with the International Union and because she filed a civil rights complaint with the Iowa Civil Rights Commission against the Union, Local 1513 retaliated by failing to adequately represent her and other women. The district court rejected this claim.

To establish a *prima facie* case of discriminatory retaliation, Martin must establish: "(1) that [she] filed a charge of unlawful discrimination, (2) that [Local 1513] took adverse action against [her], and (3) that the adverse action was linked to the filing of the charge of unlawful discrimination." *Kellner v. General Refractories Co.*, 631 F.Supp. 939, 944 (N.D.Ind.1986). *See also Gunther v. County of Washington*, 623 F.2d 1303 (9th Cir.1979), *aff'd*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). Although Martin meets the first element of *Kellner*, the district court found that Local 1513 did not unlawfully retaliate against her for anything she did. We cannot say this finding is clearly erroneous. As such, Martin cannot prove the second and third elements needed under *Kellner* to show retaliation.

## IV. CONCLUSION

We conclude that the trial court's findings of fact and conclusions of law were not clearly erroneous. The dismissal of Martin's complaint is affirmed.