Frances JONES, Beverly Harder, Eleanor Murray, Linda Nickel, and Mary Ruane, Jointly and Severally, Plaintiffs,

v.

CASSENS TRANSPORT and Local 299, I.B.T., Jointly and Severally, Defendants.

No. 78 73078.

United States District Court, E.D. Michigan, S.D.

Sept. 17, 1985.

Ronald Reosti, Gary A. Benjamin, Detroit, Mich., for plaintiffs.

Marianne Goldstein Robbins, Milwaukee, Wis., for defendants; James P. Hoffa, Detroit, Mich., of counsel.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiffs, five female office employees of the Square Deal Cartage Company until it was purchased by defendant Cassens Transport and they lost their jobs in August, 1977, filed their complaint in this matter in Wayne County Circuit Court for the State of Michigan on November 16, 1978. They claimed that both defendants had discriminated against them because of their sex, in violation of the laws of Michigan, in refusing to permit plaintiffs to bid or apply for jobs at Cassens because they were women. The complaint further charged the union with breach of its duty to fairly represent plaintiffs, either in negotiations with defendant Cassens concerning the job rights of Square Deal employees, or

in a grievance against defendant Cassens' refusal to hire the plaintiffs.

Defendant Local 299 petitioned for removal to this court on November 30, 1978, because the claim for breach of a duty of fair representation presented a federal question under § 301 of the National Labor Relations Act, 29 U.S.C. § 185, *et seq,* and because a federal question of the violation of Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq,* had been raised. Removal was proper, and this court's jurisdiction is appropriate. 28 U.S.C. § 1441.

An amended complaint was filed February 27, 1979, adding claims of defendants' violations of Title VII, 42 U.S.C. 2000e *et seq.* Plaintiffs Jones, Harder, Murray and Ruane had filed charges and obtained Right-to-Sue letters from the United States Equal Employment Opportunity Commission dated January 22, 1979 against Cassens, but not against Local 299. Plaintiff Linda Nickel had filed no charge and received no letter.

Plaintiffs had also filed charges with the National Labor Relations Board in January, 1978, that unfair labor practices had been committed by Cassens Transport in its alleged refusal to hire them because of their union membership. Those charges were later resolved by a settlement which included plaintiffs' waiver of any right to office jobs at Cassens as one of its terms. This court, nevertheless, took evidence at trial herein concerning Cassens' failure and refusal to hire plaintiffs into its office. That evidence is relevant to the issues of sex discrimination and fair representation presented herein, despite the settlement's preclusion of a grant of office work at Cassens to plaintiffs as a remedy here available.

At the bifurcated trial on the issue of liability, both defendants moved to dismiss at the close of plaintiffs' case, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The motion of defendant Cassens was denied, inasmuch as plaintiffs had made a *prima facie* case of intentional sex discrimination under both Title VII and un-

der Michigan's Elliott-Larsen Civil Rights Act, M.C.L.A. § 37.2101, pursuant to which the same standards are to be applied. *See Michigan Civil Rights Commission ex rel. Boyd v. Chrysler,* 80 Mich.App. 368, 263 N.W.2d 376 (1977); *Clark v. Uniroyal,* 119 Mich.App. 820, 327 N.W.2d 372 (1982); and *Northville Schools v. CRC,* 118 Mich.App. 573, 325 N.W.2d 497 (1982).

This court granted the union's motion to dismiss plaintiffs' Title VII claim for their failure to have presented any charge against the union to the EEOC. After trial, this court reinstated the Title VII claim under authority of the subsequently decided case of *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), in which the Supreme Court stated that:

> By holding compliance with the filing period to be not a jurisdictional prerequisite to filing a Title VII suit, but a requirement subject to waiver as well as tolling when equity so requires, we honor the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer. (102 S.Ct. at 1135)

As is fully discussed below, both defendants herein had pursued a course of secrecy and concealment of rights in their dealings with the plaintiffs; and plaintiffs each testified that they were told by EEOC personnel that the EEOC could afford them no relief against the union when they filed their charges against the employer. Accordingly, this court determined this to be a case in which equity required waiver of the requirement.

Also, the court denied defendant union's Rule 41 motion to dismiss plaintiffs' claim of breach of the duty of fair representation, and pendent thereto retained plaintiffs' discrimination claim against the union under the Michigan Elliott-Larsen Civil Rights Act.

After trial, the court entered a judgment of liability May 2, 1982 for plaintiffs on all of its claims against both defendants by a

Memorandum Opinion published at 538 F.Supp. 929. Thereafter both defendants appealed, and during the pendency of the appeal defendant Cassens settled with plaintiffs. 705 F.2d 454 (6th Cir.1982). The Court of Appeals for the Sixth Circuit thereafter (by opinion published at 748 F.2d 1083 November 29, 1984), reversed this court, dismissed plaintiffs' Title VII and fair representation claims, and remanded plaintiffs' Elliott-Larsen claim to this court for reconsideration. The Title VII claim was dismissed because that court found no basis for setting aside the requirement that plaintiffs file a charge against defendant union with EEOC: and the fair representation claim was dismissed in light of this circuit's decision to retroactively apply the six-month statute of limitations adopted for such claims in *Delcostello v. Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

In remanding the Elliott-Larsen claim to this court, the Sixth Circuit panel wrote:

We are unable to determine from the opinion below whether the District Judge found that the union's actions constituted illegal exclusion or expulsion from membership, classification or segregation of membership, efforts to cause or attempt to cause Cassens to violate the Elliott-Larsen Act, failure to adequately represent plaintiffs in the grievance process, or a combination of some or all of those prohibited activities. We, therefore, remand plaintiffs' state claim to the District Court for reconsideration in light of this opinion.

The parties have submitted their briefs on the issues raised by plaintiffs' Elliott-Larsen claim, and this memorandum opinion constitutes this court's findings of fact and conclusions of law, on remand, on that count alone.

At the outset, this court must note that it rejects the request of defendant union that it decline to retain jurisdiction of this pendent state law claim, the last remaining claim in the case. If the case had reached this posture before the month-long trial of 1982, the appeal, and the remand, this court would certainly entertain the request under a more favorable light. At this point however, plaintiffs—five women who lost their clerical jobs in 1977—will not be required to seek yet another forum for their grievance. The manifest injustice of dismissing this last claim without a decision on the merits would not even constitute a realistic conservation of judicial resources.

Michigan's Elliott-Larsen Act provides at M.C.L.A. § 37.2204, as follows:

Sec. 204. A labor organization shall not:

(a) Exclude or expel from membership, or otherwise discriminate against, a member or applicant for membership because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(b) Limit, segregate, or classify membership or applicants for membership, or classify or fail to refuse to refer for employment an individual in a way which would deprive or tend to deprive that individual of an employment opportunity, or which would limit an employment opportunity, or which would adversely affect wages, hours, or employment conditions, or otherwise adversely affect the status of an employee or an applicant for employment because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(c) Cause or attempt to cause an employer to violate this article.

(d) Fail to fairly and adequately represent a member in a grievance process because of religion, race, color, national origin, age, sex, height, weight, or marital status.

Plaintiffs herein claim that the defendant union has violated all four of the above-quoted statutory prohibitions, and this court so finds, for the reasons outlined below.

On June 3, 1976, defendant Cassens Transport, the Square Deal Cartage Co., and Gate City Transport Co. executed a contract by which Cassens was to purchase all property and assets of Square Deal and Gates. All three companies were engaged

in the business of hauling new automobiles by truck, and they utilized contiguous premises as their Detroit Terminals. At that time, the five female plaintiffs herein were employed in the Square Deal Detroit Terminal Office as clerical workers; and were represented by defendant Local 299 as were most of the employees of all three companies. Mr. Wilson Holsinger, who was Director of the Teamster Carhaul Division during the events herein litigated, testified that he had helped organize the Square Deal office in 1958, and gained recognition by a showing of cards to represent the officeworkers, while he was the Square Deal steward for yardmen and drivers.

The execution of Cassens' purchase of Square Deal was delayed until August 26, 1977, because of the necessity for federal regulatory approvals of the transaction. It was on that date that plaintiffs were each called into the Square Deal Manager's office, individually and alone, and notified by management of the termination of their employment. The last and most senior of the plaintiffs, Ms. Jones, had worked her last day by November of 1977.

Due to the union's efforts during the year-long interim between the 1976 contract and the 1977 closing, all other Square Deal employees, all of whom were male except the secretary to the chief operating officer and receptionist, had moved to work at Cassens on the date of the takeover with full seniority. The union's efforts on behalf of the Square Deal work force, except for plaintiffs, had commenced through meetings with Cassens beginning immediately after the June, 1976 contract of sale, more than a year prior to plaintiffs' job loss. Cassens did continue an office function thereafter and, indeed, expanded it considerably after the absorption of Square Deal's work force with additional new male hires into its office. The President of Square Deal from 1974 to 1977, Mr. Harold Jones, became the Terminal Manager of Cassens. Mr. Jones had started with Square Deal in 1948 and worked in managerial positions since the mid-fifties. The strong opinions which he had expressed and implemented at Square Deal, relating to female employees, may fairly be said to have been with him taken to Cassens.

The defendant Local 299 had organized the employees of Cassens, Square Deal, and Gates over twenty years prior to this consolidation and it is undisputed that the terms and conditions of employment of all employees affected by these events were governed by the Teamsters National Master Automobile Transporters Agreement, the Central and Southern Conference Area Supplements thereto (specifically Truckaway, Driveaway, City Delivery, Yard and Garage Workers', and the Michigan Office Workers' Supplements thereto). All contracts were effective by their terms from June 1, 1976 through May 31, 1979.

At Square Deal, Local 299 had historically represented employees on three seniority lists, and defendants herein have designated (improperly, as will be seen) each of those lists as a "separate and distinct bargaining unit."

Plaintiffs were on the office seniority list; and it is that alleged distinctiveness as a bargaining unit which defendants claim required their preclusion from competing for any jobs whatsoever at Cassens. The Garage employees at Square Deal were on another seniority list; and the third list included all drivers and all yardmen, as well. At Cassens the office was not organized, and there was no garage, but there were two seniority lists: one for drivers and one for yardmen. The practice of listing drivers and yardmen on separate seniority lists was the usual pattern in the autohaul industry, and Square Deal's combined driver-yard list was a rare aberration. It was the only employer in the Detroit area with a combined list. That list was implemented by Square Deal on the union's petition (after a referendum of all drivers and yardmen) in 1958, which was the year the office was organized. It is the existence of this aberrational driver-yardman list, which defendants insist constituted one "distinct bargaining unit," which led to the difficulties at hand.

All employees concerned herein worked under the Teamsters Master Transport Agreement, which provided as follows concerning the supplements thereto:

All such Supplemental Agreements are subject to and controlled by the terms of this Master Agreement and are referred to herein as "Supplemental Agreements." All such Supplemental Agreements are to be clearly limited to the specific division and classifications of work as enumerated or described in each individual Supplement. (Article 2, p. 3)

\* \* \* \* \* \*

The employees, unions, employers and Association, covered by this Master Agreement and the various Supplements thereto shall constitute one bargaining unit. It is understood that the printing of this Master Agreement and the aforesaid supplements in separate Agreements is for convenience only and not intended to create separate bargaining units.

The Master Transport Agreement further provides as follows, here pertinent,

The Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's age, race, color, religion, sex, or national origin, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of age, race, color, religion, sex or national origin.

\* \* \* \* \* \*

In those terminals where classification seniority applies, the parties agree that in filling vacancies with qualified employees which occur subsequent to the execution of this agreement, the principle of carry-over terminal seniority shall be recognized. In the event that the Employer and Local Union fail to formulate a Rider which provides for the filling of vacancies consistent with the foregoing provision, the Joint Area Committees shall have authority. (Article 26, p. 57–58).

\* \* \* \* \* \*

Terminal seniority rights for employees as provided under this Agreement and all Agreements supplemental hereto shall prevail. (Article 5, § 1, p. 16.).

\* \* \* \* \* \*

*Merger, purchase, acquisition, sale, etc:*
(1) The terminal seniority lists of the two companies should be dovetailed so as to create a Master Seniority list or lists based upon total years of service with either company. This is known as "dovetailing" in accordance with years of seniority. (Article 5, p. 17).

\* \* \* \* \* \*

... The Conference Joint Arbitration Committees provided in the National Master Automobile Transporters Agreement or the Supplemental Agreement shall have the authority to determine the establishment and application of seniority in those situations presented to them. In all cases, the seniority decisions of the National Committee of Conference Joint Arbitration Committees ... shall be final and binding. (Article 5, § 4, p. 23).

Plaintiffs herein were represented by Local 299 not only under the above-quoted Master Agreement, but under the Teamsters Michigan Office Workers Supplement thereto, to which Square Deal was a signatory employer but defendant Cassens was not, as its office was not organized. The Office Supplement's relevant provisions concerning seniority (at Article 39) were as follows:

Company seniority for employees governed by this Agreement shall be defined as the period of employment with the Company since the employee's last date of hire. Terminal seniority for the employees covered by this Agreement shall be defined as the period since the employee's last employment at the physical location covered by this Agreement. (Article 39, § 1, p. 4)

The Company shall prepare a company seniority list and Terminal Seniority list

within 30 days of the signing of the Agreement. One copy of such list shall be furnished to the Union and one copy shall be posted in a conspicuous place in the terminal. Any objection to either company and/or terminal seniority on the part of an employee must be filed with the company within 7 days of the posting of this list.

This seniority list shall be amended to include all changes each 90 days and the same provisions for appeal against company and/or terminal seniority dates reported thereon shall apply.... (Article 39, § 6, p. 7)

The Yardworkers' Supplement, Part IV of the Master Transport Agreement, governed the employment of yardmen of both Cassens (who were listed on a yard seniority list) and of Square Deal (who were listed on the merged yard-driver list) at the time of the acquisition. As to seniority, the Yard Supplement provided:

Seniority shall be recognized on job assignments whenever practicable, provided the senior employee can qualify. (Article 76, § 2, p. 172.)

Cassens had no garage workers until it absorbed those of Square Deal, on August 26, 1977. At all times relevant hereto, defendant Union represented them under the *Garage* Supplement of the Master Transport Agreement. That supplement provided as follows, concerning seniority:

§ 1(a) Company garage seniority shall be determined by the time and date each employee's payroll earnings begin, as of his last hire-in date.

(b) Garage employees shall not bump into any other division nor shall any employee from another division exercise seniority in the garage.

(c) Classification seniority shall commence at the time and date each employee's payroll earnings begin in such classification.

\* \* \* \* \* \*

§ 4 A current seniority list, complete with classification date and employment date, must be posted where it will be accessible to the employees at all times,

and a copy of same shall be mailed to the Union. [Article 80, p. 175, 176]

Despite all of the above provisions there is no evidence that any seniority list was ever posted at Square Deal, between 1955 and 1977. Those plaintiffs who had seen any of the three lists which were maintained had seen them because plaintiff Frances Jones was occasionally called upon to type them.

The above-quoted collective bargaining agreement clauses recognize classification seniority, terminal seniority and company seniority, and uniformly require that terminal or company seniority shall prevail, with the one exception of the prohibition of bumping into or out of the Garage "division." Only one single bargaining unit is recognized, and even the garage community is distinguished by the appellation "division," rather than "bargaining unit." Only in the garage, moreover, is *classification* seniority recognized, and accordingly required to be listed. It is also noteworthy that, despite all of the above requirements, Square Deal maintained no company seniority list or terminal seniority list, whatsoever. If it existed, it has never been mentioned or produced at any time relevant hereto. Similarly, if Cassens ever had a terminal or company seniority list it was not utilized, mentioned or produced during the events here under examination or at trial. Defendants herein utilized only *classification* seniority lists to determine job entitlements at the time of the Cassens' acquisition of Square Deal; they utilized one list which was unique in treating two different all-male classifications as one while excluding a third (female) classification from that benefit; and they did so in violation of every applicable contract clause and of the arbitral decision on which they here rely, as well.

Long before the Cassens acquisition of June 1976 was to be effectuated, the question arose as to how Square Deal employees would be transferred to Cassens. Square Deal had its longstanding yard-driver seniority list; but an employee, once

placed on Cassens' yard list would no longer have status to bid for driving routes while maintaining simultaneous seniority in both yard and driver classifications as he had done at Square Deal. At Cassens, a driver would not be able to bid for yard work when he could not drive, as was also done at Square Deal. It had been a foregone conclusion, however, that all garage personnel would transfer from Square Deal with full seniority and would become the Cassens' garage staff; and that is what happened. As to the Square Deal office workers: union witnesses testified that their future was never discussed; and Cassens' witnesses claimed, to the contrary, that the position was taken *ab initio* that Cassens would not accept them, and that the union had always known that fact.

Apparently to resolve the only open question, which was the question of who would be listed in the Cassens' yard or would transfer as a driver, in August of 1976, (more than a year before the acquisition's effective date) Cassens President, Jerry Shashek, filed a grievance with the Joint Arbitration Committee of the Central-Southern Conference Teamsters:

... for determination with respect to establishment of seniority board at Cassens Transport Company arising out of the purchase by Cassens Transport Company of Square Deal Cartage Company and Gate City.

That submission was made pursuant to the above-quoted Article 5, § 1(1) ("Mergers", at p. 17) of the National Master Transport Agreement. The question was referred to a subcommittee on August 28, 1976; and that subcommittee's subsequent report indicates that it "... met on Tuesday, September 21, 1976 with all interested parties *including employees from the various companies involved in these proceedings.*" [Emphasis added.] Defendant Local 299 is recorded as having represented the employees, and having "stated it preferred the employees' company seniority be used." Wilson Holsinger testified that he presented the union's position, and argued for "Master" seniority. None of the female plaintiffs herein even knew that this event was occurring.

Clearly, the Holsinger presentation narrowed the Shashek request for a determination of a *company seniority board* down to a concern about drivers and yardmen, only. This omitted from consideration the garage unit (which was assured of transfer as a separate division, as recognized industrywide) and the office "unit" of eight women among twenty office workers, whom Cassens had already told the union it would not accept. The decision ultimately issued reflects the narrowing of issues which had occurred at hearing.

The subcommittee's Decision of January 31, 1977 was first, that all drivers of the merged employers be dovetailed by years of service. As to the yard at Cassens, the decision was:

(a). Cassens practice of maintaining separate yard seniority list shall be maintained. (Referring to present 8 Cassens yard employees, plus 7 from Square Deal and 2 from Gate City.)

(b). The new yard seniority list, after merger, shall be prepared in the same way as the driver's list, by master seniority as provided in Article 5, Section 1, Subsection (1) and (2).

Reference to the cited Article reveals that "Master" seniority is a term used by these parties interchangeably with *company* seniority, meaning "total years of service with either company." The Decision, accordingly, does not preclude the inclusion of any classification into the new yard list.

On February 4, 1977, the Joint Arbitration Committee adopted the report of the Subcommittee. Until August 25, 1977, however, none of the plaintiffs had heard any more of this activity than the same rumors of the sale of Square Deal which had commenced in 1975. No one advised them of the fact of a June 1976 sale, or of the arbitral adjudication, or even of the hearing to which employees had, according to the record, been invited. Union representative Holsinger testified that he could not recall ever discussing plaintiffs' future with them, prior to the actual Cassens'

takeover of August 26, 1977; that he had hoped and expected that Cassens would take them, but had made no inquiries in that regard; that he had known Cassens had a non-union office, but had thought plaintiffs would be accepted up until August 25, 1977; and had told them not to worry. Plaintiff Nickels asked Cassens' Chief Dispatcher Belevender, during this period, about the rumor of the sale and of its impact on plaintiffs' jobs. He responded that "we're watching for the good workers, to take them to Cassens." The employer's agents, like the union's, continued to tell plaintiffs not to worry, until the effective date of the transfer.

After the adjudication, Cassens, Square Deal and the union had to determine *which seven* Square Deal employees would obtain places on the Cassens' yard list. It was decided to hold a Bid among the all-male Square Deal yard-driver listees. All yard-drivers who did not bid for those seven places, or whose bids were unsuccessful, would transfer their seniority to Cassens as *drivers,* if eligible. No notice of this Bid was posted. Notices were handed through the Dispatch window at Square Deal to each individual who was considered eligible, according to Cassens' present Terminal Manager, Harold Jones. Those individuals were the yard-driver listees. The all-male yardworkers from the Square Deal Terminal in Toledo were also given notice and the opportunity to participate. The Bid was held from August 20 through September 6, 1977.

If plaintiffs had been permitted to participate in the Bid with their terminal or company seniority, it is undisputed that at least three of them would have won jobs in Cassens' yard at that time. Cassens accepted eleven male bidders including three with less Terminal seniority than any plaintiff herein. It is also undisputed that Cassens immediately thereafter made several new male hires into its yard, for a total of 19 new persons, as opposed to the 9 contemplated by the arbitral order. By September 29, 1977, it employed 21 in the yard. The yard continued to be all male, as it always had been, and as had the Square Deal yard

as well, despite plaintiffs' numerous requests.

Plaintiffs were summoned to the Square Deal executive offices individually and terminated, on August 26, 1977. The only Square Deal office employees accepted by Cassens were six men who were not members of the union's all-female office "unit" and the transferring chief executive's secretary and receptionist.

The union has claimed, here, that it first learned that Cassens would not accept the women of the Square Deal office on August 25, 1977. The testimony concerning the transactions of union autohaul Director Wilson Holsinger is completely incredible, however, and cannot be accepted as other than an inconsistent attempt at the fabrication of a coverup. Defendant Cassens acknowledges that it never at any time intended to employ the women. It had always said it would not accept them. The union's claim that it never knew of the employer's intention until closing day, despite the year of discussions on employment rights, the two adjudicatory events in which both sides participated to the exclusion of the women, and the conduct of the Bid again, in secrecy and again to the exclusion of the women, is not credible.

Moreover, even if it is true that the union never thought of the women until Square Deal's last day of existence, its breach of its duty to them and the discriminatory character of its conduct toward them remain clear. Any questions are answered by the union's historic sex-based animus towards the women as unit-members, and its long history of disparate and less favorable treatment of women as competitors for jobs which men might seek, often for the stated reason of their sex. Square Deal's management (which became Cassens' Management on August 26, 1977) had made it absolutely clear, over the years, that women were not wanted in the yard, as they "made trouble." There is also undisputed testimony herein that Cassens' president did not want women in the *Terminal:* and that testimony is corroborated

by all of the facts here presented, although President Shashek was not a witness at trial.

Mr. Holsinger's incredible story is that, on the afternoon of August 25, 1977, Cassens' President Shashek told him (for the first time) that the Square Deal women would not be accepted by Cassens, "because of their union membership." Thomas Deedy, defendant union's Business Agent for Square Deal from 1974 through 1977, was also present. His testimony confirmed Holsinger's: Shashek stated that he wanted no union members in his office. Neither Holsinger nor Deedy claim to have raised any protest to Shashek at the time; and Holsinger testified that he took no action against Shashek or Cassens thereafter because he was unaware that such an exclusion of union members was unlawful, or an unfair labor practice.

What Messrs. Holsinger and Deedy did next was to invite two of the plaintiffs to meet them at a nearby bar that evening; and to advise the two women (in the bar) that Cassens had no jobs for the women officeworkers *because its office was computerized.* Holsinger and both women testified that he told them he sympathized with them, he would file a grievance on their behalf, and that he was leaving (on August 26th, the Cassens takeover date) on an extended business trip. He also, undisputedly, asked the women if they were willing to attend computer schools, independently, to enhance their attractiveness to Cassens, while he awaited the outcome of their grievance. They undisputedly agreed to pursue computer training on their own.

The women further insist, however, that on this occasion at the bar they not only agreed to seek computer training, but also asked for other work, in or out of the office, with or without seniority, in any capacity, at Cassens. Holsinger and Deedy deny any such requests. Inasmuch, however, as these gentlemen undisputedly told the women a falsehood, if indeed Shashek had just rejected them (for the first time) for union membership and not for their lack of computer training, the court most certainly cannot resolve other credibility problems arising from that same conversation in the union's favor. It is noteworthy that Business Agent Deedy, at that meeting of August 25 in the bar, knew that the next morning, August 26th, he would execute (on defendant union's behalf) a ninety-day casual agreement to permit a group of three young men to start work as clerical Yard Inspectors at Cassens. Before the expiration of that casual agreement in November, Cassens had hired those young men into permanent office jobs, and trained those young men to operate its computers.

Both Holsinger and Deedy steadfastly contend that no plaintiff ever in 1977, in the bar or elsewhere, asked them for yard work at Cassens. Defendant Cassens claimed, however, that the women did indeed demand yardwork after being foreclosed from their office jobs, but that Cassens always understood them to be demanding yard work with full seniority. Accordingly, Cassens claimed that it was precluded from offering plaintiffs yardwork (or any work) *without* seniority, or as new hires, even though such positions became available. Moreover, Cassens claimed (through the former Square Deal President, Jones) that plaintiffs never asked to apply as new hires for any job. Even the employer's witnesses are, in this area, totally contradictory of the union's claims.

The court credits the testimony of the two plaintiffs who, upon being summoned to the bar by their representatives and advised of their forthcoming discharge, testified that they asked for their office jobs, or for yard jobs, or for work in any capacity, as new hires or not. Their testimony was that Holsinger told them again not to worry, as he would continue to work to preserve their office jobs. As to yard jobs, however, he told them they could not bid on such work and could not perform it; indeed that they could not make it through a winter in the yard.

The next day, August 26, 1977, was the effective date of the sale of Square Deal. Each of the women office workers was

called, alone, into an executive office and discharged. The record indicates that Holsinger filed the promised grievance on that date, requesting hearing by the panel which had earlier adjudicated the seniority list merger, of the question whether Cassens was obliged to accept Square Deal office workers. Also on that date, Business Agent Deedy executed the aforementioned ninety-day casual agreement with Cassens for hire of male clericals. Deedy testified that he did so because at the end of August there was an abundance of work on hand at Cassens; far more than all of the employees of the merged companies could have handled, put together. Such an unprecedented increase in volume had occurred that it was clear to Deedy that it would not be under control for a long while. Finally, on August 26, Mr. Holsinger left on his business trip for two weeks, and remained inaccessible to plaintiffs for more than a month; until he visited the Square Deal office and those employees who yet remained to close its affairs, on September 30, 1977. He testified that "my schedule did not permit me" to contact them for "several weeks" because he had meetings in Louisville and Kansas City, and several important local meetings thereafter, as well.

By Monday, August 29, 1977, the plaintiffs had learned that yard work was definitely available at Cassens; and some had learned further that a Bid was being or had been conducted to obtain it. The plaintiffs were still working in the Square Deal office until their respective termination dates, which had been scheduled in inverse order of their office seniority; and they could see the three new young male yard inspectors; working at Cassens' contiguous premises. The plaintiffs (who had been told no more than had been disclosed at the bar) decided to request a meeting with Cassens President Shashek and a union representative. They called the union hall and were advised by Mr. Deedy not only that Holsinger was indefinitely unavailable, but that Deedy himself was otherwise engaged and would attend no such meeting. Deedy testified that plaintiffs did not mention yardwork

during that call, and that if they had, he would have told them their position had no merit. He never told Holsinger of their call, and testified that he never thereafter heard from any of the women again.

The status of plaintiffs' union representation after August 26th is another interesting and open question, on this record. They did not know who their steward was. Although both defendants stoutly maintain the separateness and distinctness of the office bargaining unit, that "unit" never had its own steward because, according to Holsinger, a Local 299 rule required a unit to include at least fifteen persons, to merit a steward. The Garage Unit, however, included fewer than fifteen persons and had never been without a steward, while the office had shared its steward *with the drivers and yardworkers* since 1958, notwithstanding the alleged total disparity of interests of those groups and separation of their units. The office staff included twenty persons, of whom only eight (all of them women) were included in the "unit." Holsinger had been the drivers, yard and office steward until he joined the union staff in 1974; and it is unknown to this record who the steward was for drivers, yard, and office, on August 29, 1977. Whoever that person was, however, it is safe to say that he had moved to Cassens with the drivers and yardmen, and was no longer available to plaintiffs.

Moreover, the women were ignorant of their entitlement to a steward, anyway; although the most senior plaintiff, Frances Jones, had paid union dues since April of 1958. No plaintiff had ever filed a grievance; and several testified to their belief that the union and the contract book existed for the benefit of the drivers only. They had never known who their steward was, if any, and plaintiff Frances Jones had called the Toledo Terminal Local 299 steward, at one point, for reassurance of their continued employment. Over the years, in the face of such disparities in treatment, the women testified that they had been afraid to complain because they needed

their jobs, and Square Deal supervision had frequently reminded them of that fact.

So, in the face of Business Agent Deedy's refusal to represent them, plaintiffs called the Square Deal Garage Steward, Glen Karkeet, to come up to the office and represent them in their meeting with Cassens' President Shashek. Karkeet went up to the office immediately, but told plaintiffs he was "only the garage steward" and without any authority in the matter. He, too, called Deedy by telephone to come represent the women, and Deedy again advised ". . . that there was no way I would have anything to do with it." When the Cassens President arrived, Karkeet testified that he told Shashek "these women want to know if they have jobs," because it was common knowledge throughout the premises that the women simply wanted jobs. Shashek, however, directed Karkeet back to his duties in the garage, forthwith, and met with the unrepresented women in the presence only of Harold Jones. What was said is, once again, hotly disputed.

The women testified uniformly that, once again, they asked first for office jobs; then to bid into the yard; then for work in any capacity, with or without seniority, or as new applicants. President Shashek, undisputedly, said that Cassens did not employ women in its Terminal; that no jobs were available either in the office or the yard; and that no woman had ever worked in Cassens' yard and none ever would, "and that's final." However, in his testimony Mr. Jones stoutly denied plaintiffs' uniform claim that Shashek also stated that no applications were available for new hires, and that none would be accepted or filed for future consideration, as had been Square Deal's longstanding practice. Jones did not deny that each plaintiff tried to describe her qualifications for yardwork, (i.e., ability to change a tire, jump a battery, or change a battery, drive a car, etc.); and did not deny his longstanding prohibition of women in the yard because they might "make trouble." Jones simply insisted that plaintiffs were told they were a "separate and distinct bargaining unit," ineligible to bid by seniority into the yard. Thereafter,

he denied that any plaintiff, then or later, ever asked to be hired as a new employee in any capacity or ever asked for an application. Mr. Jones insisted that plaintiffs only sought consideration as bidders into the yard, with full seniority. Cassens' witness made no mention whatsoever, during trial, of either their lack of computer training or their union membership. In the totality of circumstances presented, this court credits the plaintiffs' uniform and consistent insistence that they requested consideration on every basis conceivable to them at the time, and were rejected.

Plaintiff Jones, the most senior of the women, worked until November 12, 1977, closing out Square Deal's offices; and on that date she filed three grievances. On two of them, regarding unpaid sick and holiday pay, she ultimately prevailed, although no monetary remedy was awarded, she testified, because Square Deal had become nonexistent in the interim. The third grievance protested Cassens' refusal to employ any of the Square Deal women office workers. Local 299 President Lins wrote her, in response, that it would be heard by the same Conference Committee to which Holsinger's grievance had been referred. Lins did not direct the grievance to that panel however, but diverted it to a Michigan *Officeworkers'* panel instead, which was without authority to grant the expansive relief which a Conference Committee was empowered to afford, such as yardwork. Both the Holsinger and the Jones grievances were denied in January of 1978, and there is no indication of record that the union made any presentation on behalf of either grievance.

When Holsinger's allegedly more pressing duties had subsided, on September 30, 1977, he went to visit those few plaintiffs still at the Square Deal office, because he "felt sorry for them, as a personal friend," and to give them a copy of his August 26th grievance. They renewed their plea for union intervention to obtain yardwork, and as a personal friend he again advised them that they could never survive a winter in the yard. He denies, however, that any

request for yardwork was made on this or any occasion, and again this court is unable to credit his version of the facts.

■ The credible facts of record here clearly demonstrate that, in competition for the better jobs historically; and for any jobs at the end, the plaintiff women were the victims of intentionally disparate and less favorable treatment than the similarly situated male employees at Square Deal whom this union represented. Both the union and employer intentionally discriminated against them, albeit for somewhat different reasons. Employer management, in the person of Messrs. Jones and Shashek, had a sex-based animus against female workers on the premises. The union pandered to that animus in its zeal to represent its male members (and even male outside applicants for jobs) at the expense of the women, whom it considered to be no more than an auxilary to the real bargaining unit, and a source of unobligated dues for twenty years. The union's testimony was consistent that plaintiffs had the more *"pleasureable"* jobs, and were not considered for the better *paid* jobs, or those which afforded overtime and/or less likelihood of layoff. Both defendants made obvious misrepresentations both to plaintiffs and to this court. The secrecy in which the defendant union disposed of plaintiffs' interests adds to the incredibility of its several conflicting and contradictory versions of these events. In short, only plaintiffs and the Garage steward, Karkeet, appear credible in their narrative of events as they saw them.

■ Defendant union, this court finds, breached its duty to fairly represent plaintiffs, under the circumstances presented. The standards applicable to such a claim were definitively stated in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) in which all unions certified under the National Labor Relations Act were held to have the statutory duty to represent all employees in the collective bargaining unit fairly, both in collective bargaining with the employer, and in enforcement of any resultant contract. That duty includes the

obligation to serve the interests of all members without hostility or discrimination towards any. Both unit members and employers should be assured that similar complaints will be treated consistently. A breach of this duty occurs when a union's conduct towards a member of its unit is arbitrary, discriminatory, or in bad faith. *Vaca* refers us to *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), a case which is particularly apposite because it treats the question of fair representation when one employer absorbs the business (and seniority lists) of another, in a multi-employer bargaining unit represented by one union and covered by a collective bargaining agreement which specifically provides (as does this one) that the seniority status of all affected employees may be submitted to a Joint Arbitration Committee.

In *Humphrey*, certain of the employees of the absorbing employer (equivalent to Cassens' employees, here) sued the union, claiming breach of its duty after they were laid off as a result of the Joint Arbitration Committee's dovetailing of the two employers' seniority lists. In rejecting the claim of those plaintiffs, the Supreme Court relied upon a series of findings which the record in this case clearly fails to suggest. The court noted that the *Humphrey* plaintiffs had been made aware of the struggle for jobs simultaneously with the other employees concerned; had been given notice of the adjudication of their rights which would occur before the Joint Arbitration Committee, and had been given a fair hearing before that body on the issue. Moreover, it was noted that the collective bargaining agreement had empowered the arbitration committee to integrate the seniority lists on some rational basis and that such had indeed occurred; and finally that a union is not guilty of such a breach when it takes a good faith position contrary to the interests of some individuals represented, and that the position taken had indeed been a good faith one.

In this case, the struggle for jobs, the adjudication of their rights, and the very

fact of a Joint Arbitration Committee hearing were all kept secret from these plaintiffs until their employment had terminated and they were not given a fair hearing before the decision making body at any meaningful time. Their position was not even presented to the Joint Arbitration Committee and it did not, therefore, adjudicate their rights on any rational basis other than by omission. Moreover, the Joint Arbitration Committee's decision did not require the actions thereafter taken against plaintiffs by their union, in conduct of an all-male Bid. The local union's actions were based upon invidious sex discrimination and no other reason. The union agreed with the employer that women did not belong in the yard and further, it was the position of the chief union operative, Holsinger, that the job security of the women, because of their sex, was a matter of less weighty concern than that of men. Under authority of both *Vaca* and *Humphrey*, accordingly, plaintiffs have made their case, by more than a preponderance, that defendant union breached its duty of fair representation to them. It did so because of their sex.

▇▇ The union has affirmatively claimed that plaintiffs failed to exhaust their administrative remedies through the contractual grievance procedure, or to pursue their internal union remedies for the alleged breach of a duty to represent. It is first noted that no internal union remedies have been shown to exist, on the record. As to the claimed failure to exhaust the grievance procedure, the record reflects the Union Business Agent's undisputed flat refusal to represent the plaintiffs in their only meeting with Cassens' executives about their loss of jobs. Business Agent Deedy testified that he absolutely refused to become involved with such a meeting and that the women's position, as he claimed to understand it, had no merit. Of the grievances which plaintiff Jones filed, and which Union Agent Holsinger filed on plaintiffs' behalf (and President Lins referred to the wrong committee), there is no record of any union representation at the time of their final denial by Joint Arbitration Committees. The Sixth Circuit, moreover, is not one which requires exhaustion where a union member is unaware of his or her remedies. See *Geddes v. Chrysler*, 608 F.2d 261 (6th Cir.1979). These plaintiffs, undisputedly, were not only unaware of their remedies but were deliberately deprived of notice of the arbitral adjudication of their rights upon which the union here relies. Other employees of both firms were present at the hearing of which plaintiffs were kept ignorant. Similarly, the union's claims that plaintiffs claims were barred by a grievance arbitration award, are also without merit under circumstances in which the award relied upon was obtained in secrecy from plaintiffs and without consideration of their interests.

The union's conduct towards these plaintiffs was, on the facts set out below, plainly sex-based discrimination; and evinced the clear intention of the union (from the first notice of Cassens' purchase of Square Deal) to prevent these women from utilizing their terminal or company seniority to compete for jobs against similarly situated men or even to compete as new applicants against new male candidates. Such conduct breaches a union's duty to fairly represent all bargaining unit members.

In *Farmer v. ARA Services, Inc.*, 660 F.2d 1096 (CA 6, 1981), this circuit had occasion to consider the claim of a group of female employees that their union had breached its duty of fair representation by participation in the employer's sexually discriminatory practices. The district court had found that the union had negotiated a contract which served to perpetuate discriminatory employer hiring and assignment patterns; had relegated the vast majority of female employees to a lower-paid part-time classification while males competed for higher-paid full time jobs; and had negotiated lower rates for women than men, with lesser promotional opportunity. The Sixth Circuit, affirming, found that the union had breached its duty within the meaning of *Vaca v. Sipes, supra*, by failing to represent the interests of the women in negotiations, and that the conduct which

resulted in the union's breach of its duty of fair representation also made out a Title VII violation. That court wrote, further, at 1104:

> The union is prohibited under Title VII from discriminating against any individual with regard to employment opportunities because of his or her ... sex ... or from causing or attempting to cause any employer to discriminate against an individual on the above-enumerated bases. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 284–85, 96 S.Ct. 2574, 2580–81, 49 L.Ed.2d 493 (1976); *EEOC v. Detroit Edison,* 515 F.2d 301, 314 (6th Cir.1975), vacated and remanded on other grounds, *sub. nom. Utility Workers Union v. EEOC,* 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977). A labor organization can be held jointly and severally for acquiescing in the discriminatory practices of the employer....

\* \* \* \* \* \*

A union's role as a joint participant in the negotiation for a collective bargaining agreement has been found sufficient to render it liable under Title VII where the contractual provisions were discriminatory in operation or perpetuated the effects of past discrimination. *Robinson v. Lorillard,* 444 F.2d 791, 799 (4th Cir.), cert. dismissed 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *Head v. Timken Roller Bearing Co.,* 486 F.2d 870, 875 (6th Cir.1973); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 348, n. 30, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977). In fact, it is almost axiomatic that a union's breach of a duty of fair representation also subjects it to liability under Title VII if the breach can be shown to be because of the complainant's race, color, religion, sex or national origin.

In *Mitchell v. Mid-Continent Spring Co.,* 583 F.2d 275 (1978), this circuit considered the type of employer rationalization and conduct in which this union actively participated. It held that Title VII prohibits the use of popular stereotypes or even statistics to attribute general group charac-

teristics to every individual member of a group. Accordingly, it was unlawful for the employer to assume, without testing, that only men could successfully perform the highest-paying jobs (which required lifting) and to relegate all females to a separate seniority list eligible only for the lowest-paid positions. Here, Holsinger was vocal in the offer of his stereotypical opinions as reasons for all that has happened to these women. He at least claimed to believe that they, because of their sex, were suited only for the "most pleasurable" jobs, could not survive a winter in the yard and were too emotional about their work. For those reasons he concurred, on all occasions, in the overtly sexist requirements of management that no women work in the yard or, ultimately, in the Terminal.

▮ In a claim of disparate treatment against an employer, plaintiffs under either Title VII or the Michigan Elliott-Larsen Civil Rights Act must prove a *prima facie* case by a preponderance of all of the evidence, which "consists of facts sufficient to sustain the inference that the challenged action of the employer was motivated by impermissible considerations." *Mosby v. Webster College,* 563 F.2d 901 (8th Cir. 1977). The requirements of the *prima facie* case on a complaint of discriminatory non-selection, as stated by *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1973), are that the plaintiff show that (1) she belongs to a minority or statutorily protected group, (2) that she applied for and was qualified for a job for which the employer was seeking applicants, (3) that despite her qualifications she was rejected, and (4) that after her rejection the job remained open and the employer continued to seek applicants from persons with plaintiffs qualifications. A *prima facie* case may also be made by "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those acts were bottomed on impermissible considerations." *Furnco Construction*

*Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

As the court stated in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

"Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical,* although it can in some situations be inferred from the mere facts of differences in treatment....

 Here, there is no longer any dispute but that plaintiffs have made a overwhelming *prima facie* case of intentional discrimination or disparate treatment, under Title VII, against Cassens Transport. They have also made a *prima facie* case, by authority of *Farmer, supra,* against the defendant union.

Cassens did not want women in its terminal and the defendant union contrived that, despite its obligation to these women members, there would be none. Its course of conduct to the end constitutes violations of all of the Elliott-Larsen Civil Rights Act's prohibitions against labor union conduct.

It again must be noted, in evaluating plaintiffs' *prima facie* case under Elliott-Larsen, that Michigan courts have uniformly applied the federal substantive law of discrimination, and the federal allocation of burdens, in adjudicating cases filed under Elliott-Larsen. See *Michigan C.R.C. v. Chrysler,* 80 Mich.App. 368, 263 N.W.2d 376 (1977); *Clark v. Uniroyal, supra,* and *Northville Schools v. C.R.C., supra.*

Accordingly, inasmuch as plaintiffs have made a *prima facie* case that the union's breach of its duty to fairly represent them because of their sex constituted a violation of Title VII, those facts also constitute a violation of M.C.L.A. § 37.2204(a), as a failure to fairly and adequately represent members in the grievance process because of sex. Similarly, the above-outlined facts present a *prima facie* case of violation of M.C.L.A. § 37.2204(a) and (b), as (a) discrimination against a member because of sex, and (b) limiting, segregating, and classifying members; failing and refusing to refer for employment in a way which would deprive an individual of employment opportunity and which would adversely affect employment conditions because of sex.

Finally, a *prima facie* case was made under M.C.L.A. § 37.2204(c) that this union caused or attempted to cause an employer to violate this article. By foreclosing plaintiffs, because of their officeworker classifications, from participating in the Bid for Cassens' yardwork which the Arbitration Committee had ordered to be conducted by Master (Company) seniority, the defendant union made it inevitable that Cassens maintain an all-male yard. Moreover, by refusing even to advise plaintiffs that it was authorizing Cassens to hire casual yard worker/clericals after the bid; and by refusing to meet with plaintiffs and Cassens management on the subject of jobs, this defendant union attempted to cause an employer to violate M.C.L.A. § 37.2202(a) by failing or refusing to hire ... because of sex.

 When a court concludes that a Title VII (or Elliott-Larsen) plaintiff has proven a *prima facie* case of disparate treatment then the court must consider the defendant's explanation or justification for the presumptively discriminatory action. The type of defense that the defendant must then articulate depends upon the type of claim asserted by the plaintiff. In a disparate treatment case, the defendant must articulate "a legitimate non-discriminatory reason" for its actions. *McDonnell-Douglas, supra.* Thereafter, the disparate treatment plaintiff may still prevail if she can, finally, establish by a preponderance of the evidence that the apparently nondiscriminatory rationale which was articulated by the defendant served only as a pretext for the in fact intentionally discriminatory acts or practices in question. *See, Board of Trustees of Keene St. College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d

216 (1978); *Grano v. Department of Development of the City of Columbus,* 637 F.2d 1073 (6th Cir.1980). The *Grano* court further noted, at footnote 7, 637 F.2d at 1081, that:

> Because discriminatory intent is so difficult to prove by direct evidence, it is incumbent upon a sensitive decision maker to analyze all of the surrounding facts and circumstances to see if discriminatory intent can reasonably be inferred. See *Arlington Heights v. Metropolitan Housing Development Co.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

On the basis of the settled law outlined above, and the findings of fact set out below, this court finds that plaintiffs herein have not only made a *prima facie* case that defendants herein disparately treated and unlawfully discriminated against them because of their sex; but also that defendant union has failed to articulate legitimate nondiscriminatory reasons for its disparate treatment of plaintiffs; and that such reasons as defendant has suggested for its conduct are in fact pretextual for unlawful sex discrimination, in violation of the Title VII of the Civil Rights Act of 1964, as amended, and the Michigan Elliott-Larsen Civil Rights Act, M.C.L.A. § 37.2204.

Also, for the reasons explained below, the court specifically notes that the claim of defendant that its conduct toward plaintiffs was immunized from liability by the protection which Title VII affords a *bona fide* seniority system under § 703(h), and which Michigan law also affords at M.L.C.A. § 37.2211, is utterly without merit. Defendant not only was not required by any seniority system to discriminate against plaintiffs as it did; but in fact it discriminated in violation of the applicable contract seniority provisions.

In evaluating the legitimate nondiscriminatory business reasons articulated by defendant union for its conduct toward plaintiffs the court first notes that a preponderance of the evidence indicates that the excuse that it did not know of the plaintiffs' desires or availability for yardwork is pretextual. Defendant knew that the plaintiffs sought jobs, on any terms, and discriminatorily pressed for those which were available at Cassens only for males who were, as will be seen, no more qualified than were plaintiffs, and who had no greater entitlement thereto than plaintiffs, as will be seen. Indeed, males with less terminal or company seniority were awarded the jobs on which plaintiffs were not permitted to bid. The union never advised plaintiffs of the availability of *new* jobs at Cassens, and even approved the hiring of new male clericals to be trained by the employer, while advising plaintiffs to seek training independently.

The defense next articulated by the union, that the Joint Arbitration Committee award required plaintiffs' preclusion from the Bid of August 1977, is also pretextual. The Arbitral decision requires only that seven employees from Square Deal be taken to Cassens' yard list, and that a new yard seniority list be prepared by "Master," or company seniority. If plaintiffs had been permitted to utilize their company seniority to bid and had not been limited to *classification* seniority as officeworkers and precluded from the bid as well, they all would have won jobs at Cassens and the plain language of the arbitration award would have been fully honored.

The next nondiscriminatory reason articulated is that the applicable collective bargaining agreements required that plaintiffs be prohibited from participation in the final Bid. That argument is clearly pretextual for invidious discrimination. First and foremost, the Merger Article of the Master Agreement, which is cited in the Arbitration Award itself (Article 5, page 17), provides that "the terminal seniority lists of the two companies should be dovetailed so as to create a Master seniority list or lists *based upon total years of service with either company.* There is no requirement of separation by division or by classification as defendants here argue, except for the Garage, when a merger occurs. Moreover, the nondiscrimination Article of the Master Agreement provides that, in those

terminals where classification seniority obtains, terminal seniority shall prevail. (Article 26, p. 57–58.) Only the Garage supplement precludes use of competitive seniority against persons in another "division". The Arbitration Committee, moreover, is contractually authorized to supersede contractual terms and, insofar as those terms may be construed against plaintiffs' bidding rights, it appears to have done so in this case. The Arbitral proceeding and the ensuing Bid were kept secret from plaintiffs so that plaintiffs would have no opportunity to present their obviously good case for specific inclusion to the Arbitration Committee. Nevertheless, they were not excluded.

The argument that the office, which had been governed by the Master Freight agreement until 1971, had not accumulated Master Transport contract competitive seniority status, is equally flawed and pretextual. Drivers historically, up to the very date of the merger, were compensated either under the Master Transport or Master Freight agreements, depending upon what they hauled and how far, and continued nevertheless to accumulate unbroken Master Transport contract seniority over all the years of their employment. How, moreover, can the union argue that seniority under the Yardworker Supplement is fungible with seniority under both the Master Freight and Master Transport Supplements, while seniority under the Office Supplement is fungible with none of the others? There is no justification.

■ We come next to the argument that consistent historical past practices at the Square Deal workplace had, essentially, constructed *de facto* separate and distinct bargaining units for the garage, drivers-yardmen, and office, and uniformly prohibited transfers or bidding with seniority from any one "unit" into another. This argument, of course, does not meet the question of why plaintiffs were not referred by the union to apply as new hires at Cassens. Defendant nevertheless argues strenuously that uniform past practices have placed a gloss on the contract

language which must be honored here, and which is immunized despite any discriminatory impact, under § 703(h) of the Title VII, 42 U.S.C. § 2000e–2(h).

If such a *de facto* system were indeed established, this court must measure its *bona fides* and immunity in accordance with the standards applied to *de jure* systems: and these standards were recently examined by the Sixth Circuit Court of Appeals in *EEOC v. Ball Corporation,* 661 F.2d 531 (1981). That court wrote that, to qualify for 703(h) protection, the system must operate to "discourage all employees equally from transferring between seniority lists," and the policies in question must have been "negotiated and maintained free from any illegal purpose," citing *James v. Stockham Valves & Fitting Co.,* 559 F.2d 310, 352 (5th Cir.1977) cert. denied 434 U.S. 1034 (1978). The system on which defendant relies herein, whether *de facto* or considered as *de jure* by adoption of their interpretation of their contracts, cannot qualify as *bona fide* under that standard. It does not operate uniformly, except against women, and it has not been maintained (if negotiated) free from unlawfully discriminatory purpose.

Defendant Local 299 and Square Deal had, by August of 1977, completely undermined the integrity of all applicable seniority provisions by their practices: which were to provide complete freedom of movement and opportunity for jobs in the various units and as to contract supplement applicability, for all employees except the women who were placed in the "office bargaining unit" and not permitted to move out, even temporarily. Although there were no requests to move into the female *unit,* the union freely provided office work for men in other units, who continued to be paid at their prior rates under other supplements. As mentioned above, no seniority list was posted anywhere, despite the uniform requirement in every supplement of posting. Moreover, *no company or terminal seniority lists existed:* only classification lists, and a garage division list, were ever prepared or utilized. That practice

was in patent violation of the nondiscrimination article of the Master Freight Agreement, which required that terminal seniority prevail over classification. The classification seniority lists, moreover, did not reflect the true location or duties of the persons listed thereon. Persons on the driver-yard list were assigned to work in the garage or office, at will; for lack of work or inability to work in their own "unit." Only plaintiffs were limited to the opportunities available within their classification and laid off for lack thereof.

In 1958, the merger driver-yard list at Square Deal was created because according to Wilson Holsinger, "we wanted to maintain that yard work for our Truckaway Drivers." The union petitioned for a merger of those two lists of men who worked under two different contract supplements, the same year that Holsinger organized the separate office unit. The record indicates clearly that this local union's overweening desire and purpose, in creation of its *de facto* "systems," and maintenance of "divisions" was to provide the best available job opportunities, regardless of "units," for the all-male drivers, and their male progeny, as described elsewhere in this opinion. Any job assignment or "bargaining unit" on the premises was available to drivers who could not drive for lack of work, lack of equipment, ill health, old age, or for failure to meet regulatory qualifications.

The seniority list or "unit" in which an employee was listed, as frequently as not, bore no rational relation to the duties in which that employee was engaged, or the community of interest which he or she shared. The women were simply assigned to the office bargaining unit, while the men were free to pursue opportunities between and among all areas of the establishment, frequently with no alteration of their formal designations whatsoever, and never with reduction of pay rate to the level of the women's contract. The men retained their formal designations on the most advantageous list available when working elsewhere, or even when their regular jobs would have been more appropriately included in the "office unit" if that unit were not

in actuality the women's unit, the lowest paid, and the unit with least overtime. The women's unit was the most disadvantaged in every respect. It did not even pretend to include all office personnel, but only the eight females among 20 office workers. Other male clericals throughout the terminal were carried routinely on other seniority lists. There were no incentives to move into this unit, but many to move out; and the women, despite innumerable requests, were never given that opportunity.

In examining defendants' "separate units" argument the Garage unit should be considered first because since 1955, nationally, the garage division/list has been contractually isolated. Article 80 of the National Master Transport agreement flatly prohibits bumping into and out of the Garage division: and defendant union's administration of and past practice under that Article give considerable insight upon the *bona fides* of its claim concerning its *de facto* isolation of the office, by past practice. The record reveals that the Local has not honored the prohibition against bumping into or out of the Garage; although that is the *only contractual prohibition* against such bumping in any contract or supplement presented herein. That provision was treated, historically, as a mere formality.

The *highest paid* clerical employee in the Square Deal Terminal (a male) was employed in the Garage Division as a "parts clerk." His work flow was direct to the office accounting department. When plaintiff Ruane was assigned to work in the Garage, however, as a cost-analysis clerk for heavy equipment, she too reported directly to the accounting department: but she was paid at a lower rate and kept on the office "unit" seniority list. The Garage division was also utilized, informally, as a temporary assignment for drivers idled by truck breakdowns, health problems, or lack of work. Both defendants readily admit that drivers under such circumstances would be paid hourly, under Garage supplement rates, and "work extra" in the Garage unit until times got better. Holsinger

named four drivers, who were worked "extra" in the garage, rather than laid off. Indeed, Holsinger testified that a "recognized exception to the rule against crossovers" was lack of work. That exception has never been made for any woman, however, and only women employees comprised the office unit. Women did not constitute all office or clerical workers; and no woman ever worked on the garage, yard, or drivers list or at those rates at either Square Deal or Cassens.

As noted above, the industry practice of maintaining separate driver and yardman lists was abolished at Square Deal at the request of the union in 1958, to provide continued status for nondriving "drivers." The consolidation of those nationally recognized separate and distinct communities of interest again belies the *bona fides* of defendants' claim of the integrity of its classification seniority system and the inevitability of its operation against plaintiffs in this instance. Indeed, the yard unit shares far greater community with the office unit than it does with drivers, although all three worked under different contract supplements. Yet the classification list of drivers was merged with the yard to provide them exactly the job security which was denied to plaintiffs herein not only in 1977, but on numerous occasions in the years prior. The yard and office were both paid at hourly rates; were both bound to the terminal; both reported to the chief dispatcher; were both concerned with load makeup; and both shared more similar benefit packages than did the drivers, who were paid by mileage under the Truckaway contract, and performed their duties on the road. Nevertheless, Local 299 had no difficulty, whenever necessary, in paying a driver assigned to the yard pursuant to the yard contract supplement, and permitted the accrual of seniority in both classifications. It is notable also that three male clerical "yard inspectors" were employed at Square Deal from 1975 to 1977 and that those three men transferred to Cassens to work in that same classification. Plaintiff Harder had performed the yard inspector duty on some occasions and testified that the incumbents generated data which plaintiff Nickels then formalized in the office, for the processing of claims. The inspectors were never included in the office "unit," and plaintiffs (despite requests) were never permitted to claim those jobs. Aside from the distinctiveness of the office unit, Terminal Manager Jones suggested in his testimony that plaintiffs might lack the special qualifications required to perform the yard inspector job: the ability to identify damage on an automobile.

Both Holsinger for the union and Harold Jones for Cassens, strenuously attempted to justify the merger of driver and yardman classifications and the isolation of the office, with testimony that every yardman was required to have federal certification as a truckaway driver, autohaul experience, and a chauffeur's license; and that no person was permitted to work in the yard who was physically unfit to drive, or unable to meet federal regulatory physical standards. Both witnesses later conceded the of that testimony. Square Deal hired persons into the yard with no prerequisites whatsoever, not even a driver's license. Holsinger conceded that he had trained the sons of several drivers who were hired into the yard with no skills at all, made truckaway drivers of them, and that they thereafter bid for routes as drivers, annually, as everyone on the yard-driver list could do. Holsinger could train a yardman to drive in two weeks, to load cars onto a trailer in another two weeks, and considered him a fully capable truckaway driver after a year of occasional assistance. He gave this training to the sons of drivers Rowland, Holland, Boone, Woodard and others. Testing for the federal certification was then conducted internally, as well. If the yardman did not wish to drive routes, he was free to remain unqualified and remain in the yard at far higher compensation than any person in the office unit.

Among those who remained in the yard were also those drivers who had bid for and won an annual route, but who were not driving it for lack of shipments, or because their truck was broken, or because they

had become too sick or old to drive, or because they could not pass the federal physical examination. The yard furnished a place to work until one could drive again, or could retire. Holsinger himself acknowledged that, as a driver, he worked the yard and the garage after surgery rendered him too weak to drive; and that when he felt too weak and cold for any of the above, he sat in the dispatcher's office. The court credits plaintiffs' testimony that he was permitted to work in the office as well, as were others who remained on their other seniority lists, at higher rates of pay than the office "unit" members who had no transfer rights under any exigency.

The office "unit" included all women clericals, even if located in the garage, as plaintiff Ruane was as a garage costs-analysis clerk. The office unit did not, however, include the male garage parts clerk; or the male yard inspector clericals; or the dispatchers (all male, of whom there were three full-time and two part-time, located in the office); or the men who worked "in claims;" or the all-male assistants to the all-male supervisory staff; or the male payables clerk, Whitman, although it did include the female receivables clerk, Mazey.

The office unit was one into which no one requested entry, from 1955 to 1977, although the office itself was utilized for temporary refuge from layoff for persons on other seniority lists and paid under other contracts, at will. There were *many* requests from plaintiffs to leave this disfavored unit through those years, however; and not one was ever granted, even when the alternatives were short workweeks, layoffs, and ultimately discharge.

The members of the office unit had the status of the lowest-paid union-represented people in the entire car-haul industry. Frances Jones, the most senior plaintiff, left Square Deal at an annual compensation of approximately $17,000.00 in 1977. She worked on payroll and was aware of yardmen who earned between $25,000 and $30,000. Their hourly rate was $0.50 higher than the office, and they had the opportunity to work substantial overtime.

Defendant makes much of the fact that the contract supplement applicable to the office seniority list included a guarantee of at least a 40-hour work week, and that plaintiffs were protected from layoffs in other classification lists by their standing on a separate office list.

The value of those "protections" was demonstrated in 1974, however, when Local 299 acknowledges that it waived the 40-hour guarantee for the office "unit" and plaintiffs all worked three days weekly, although the work week was never reduced in the yard, and no layoffs occurred in the yard, either. Holsinger admitted, also, that plaintiffs had enjoyed no advantage whatsoever insofar as layoffs were concerned, in the office unit; and that a driver or yardman could be laid off for several months of any given year and still earn more than any women in the office unit. Also, it must be reiterated, it is undisputed that the Local and Square Deal made work available in other units (including the office) for any male employee who might otherwise be laid off. The converse was never available for any member of the all-female office unit.

The layoff experience of all but the most recently hired plaintiffs was an unfortunate one. Undisputedly, in the early 1970's many of the women were laid off when no one else was, at all. Plaintiff Harder was hired in 1965 and laid off for one year from 1967 through 1968, for two months in 1971, and for six months in 1973 and 1974. In response to her many requests for work in the yard, and her expressed concerns about the support of her eight children, Local 299's Holsinger told her that she was "too emotional" about layoffs, and worried too much. He told her to be glad that she always had a good job, "the most pleasurable job" at Square Deal to come back to; and he advised her "as a personal friend" not to press her requests for yard work.

Plaintiff Ruane was hired in 1969, laid off for four months at Christmas in 1970, and for six months in 1974–1975. When Square Deal's (and later Cassens') Mr. Levinson recalled her in 1975 she had found a

job with the City of Fraser, and bought a house. She asked Levinson if this was a permanent recall, because she had heavy responsibilities. Mr. Levinson told her she could count on him and not to worry: so she left the new job to return to Square Deal.

Plaintiff Nickels was hired in June 1973, laid off for two years, and was recalled in 1975, at which time she left a new job because she would be represented by a union at Square Deal.

All of the plaintiffs herein asked both defendants more than once prior to August of 1977, for either driving or yardwork or both, and all were rejected. Defendants have stipulated that defendant Cassens had received applications from women to drive prior to the merger, as well, but never tested one.

At Square Deal, plaintiff Frances Jones had been aware that women were drivers during World War II, but none since. She repeatedly asked to drive, over the years, because of the high income earned thereby. She asked Square Deal supervisors Bigger, Boari, Schultz, Jones and Levinson, as well as the union's agents. Every response was negative, and every response referred to her sex. Plaintiffs Nickel, Ruane and Harder all testified that they asked for driving and/or yardwork and were laughed off; were told that they could not tie down cars or load a truck, could not bear the cold; or otherwise would not be seriously considered, basically because of presumptions applied to their sex.

Inasmuch as defendants appear to have articulated, ever so tentatively, some question as to whether the plaintiffs were *qualified* for any work other than the office jobs which they undisputedly did perform, their demonstrated capabilities and responsibilities must be examined.

All of the plaintiffs operated a variety of office machines. Plaintiff Jones prepared the Square Deal payrolls, *inter alia,* from 1955 through 1977. Others did billings and prepared damage claim reports on the basis of the jottings of the higher paid yard inspectors. As garage costs clerk, plaintiff

Ruane had calculated and recorded the cost of operating each truck; and was responsible at another period for dispatching of sunroofed cars from Lansing to dealers along the routes of the drivers. That task required coordination of the drivers, the sunroof plant, the routes and the loads, all to minimize costs and by telephonic directives. Ms. Ruane was also responsible, at another period, for ascertaining and reporting to the Chrysler Corporation on the status and whereabouts of Chrysler automobiles listed on computer printouts for inquiry, called "delay tapes." At the dispatch window, various plaintiffs were made responsible for pulling the keys needed for each truckload of cars, and metering gasoline to drivers.

Nevertheless defendants suggest that none of the plaintiffs were qualified to perform any work other than that which was taken from them. The vagueness of defendants' "qualifications" suggestions may be due to the fact that they never tested plaintiffs' qualifications for any job on the premises of either Square Deal or Cassens, or gave them the opportunity to perform any job which they were unable to perform. But further, the extremely minimal "qualifications" which the male incumbents have brought to those jobs, with apparent success, are so very glaring that it ill-behooves them to raise the subject at all.

When asked of the qualifications he required for the Dispatchers job, Mr. Jones, Cassens Terminal Manager, advised this court that the job was at the core of Terminal operations and required a man of independent judgment, a man capable of complex decision making, a man capable of handling money, a man capable of reprimanding a driver, etc. The court notes further that the job has been successfully filled by a series of former security guards and watchmen. No tests were given. No educational or experience requirement existed and no objective challenge has been raised to the claim of several plaintiffs that they can do the job: except for the stated requirement that the incumbent be a man.

As to the yard and driver jobs, defendants suggest not only enormous intellectual requirements, but that the physical demands of those jobs are so great as to be beyond the capacity of any female. Again, it is noted that plaintiffs' capacity to perform those jobs was never tested, despite innumerable requests therefor. It is also noted that defendants have never suggested *which* of the innumerable qualifications they list for these jobs (for the first time) the plaintiffs might fail to meet. The court, however, will accept without listing here the extraordinary catalogue of feats which defendants argue must be performed in the yard, and as a driver. That well may be. However, one learns from this record that one cannot be too weak, too sick, too old and infirm, or too ignorant to perform these jobs, *so long as one is a man.* The plaintiffs appear to the layperson's eye to be far more physically fit than many of the drivers who moved into the yard, over the years, according to the testimony of defense witnesses. Plaintiff Harder pumped gas and cleaned a gas station among other jobs, when Square Deal closed. Plaintiff Murray had been a wartime riveter of airplane doors, which she lifted in the course of that job, plaintiff Ruane (like all the others) could drive, change tires, and change batteries. In short, they were all at least as fit as the men with serious physical deficits and disabilities who held yard jobs. As to the intellectual qualifications, none beyond the ability to read and write existed, except for the jobs which plaintiffs held in the office. Plaintiffs were, on this record, as qualified as any male who obtained any position at either Square Deal or Cassens which they were denied.

Plaintiffs sought jobs at Cassens not only on the basis of their Square Deal seniority but as new hires, and were discriminatorily rejected on that level, as well. The union advised them that they were ineligible and not to apply, and refused to participate in the meeting which they held with management. After plaintiffs were terminated at Square Deal on August 26, and were rejected as new hires by Cassens President Shashek on August 29, 1977, and after absorbing all of Square Deal's male bidders, Cassens hired new male employees of no greater qualifications in substantial number, both into the office and the yard. The union entered a "90-day casual" agreement to permit those hires. The conduct of both defendants in proceeding to effectuate brand new hires as they rejected plaintiffs pleas was clearly intentional, disparate and sex-based discriminatory treatment.

The Arbitration Award and the Bid of August 1977 obviously contemplated the existence of a total of seventeen jobs in Cassens' yard. But by September 29, 1977, Cassens had 21 men listed on its yard seniority list. Four of those had been hired aside from the bidders on September 2, 1977, and were totally new employees. Also, on August 26th the defendant Local Union had executed the casual agreement permitting the three young male "yard inspectors" to work without seniority listing for 90 days. So 24 persons worked in the Cassens' yard from September 2d until November when the three casuals were hired into permanent status in the office. Two other male office clericals were newly hired into the office during October.

Defense witnesses testified uniformly that the upsurge in the autohaul business of fall, 1977 was the greatest ever known to their experience, and did indeed require an immediate and substantial number of new hires at the Cassens Terminal, in all divisions. The discriminatory nature of their rejection of plaintiffs, under all of the above facts and circumstances, is overwhelmingly apparent.

On this record it is clear that defendant union treated plaintiffs disparately and less favorably than similarly situated males, and that its conduct constituted intentional invidious sex based discrimination, under all of the well-settled law cited above. Plaintiffs were never even fairly afforded the protection which their Master contract seniority system afforded them. The union's conduct also constituted a clear breach of its duty to represent the women fairly as members of the Square Deal col-

lective bargaining unit because of their sex.

The nondiscriminatory reasons articulated for defendant's otherwise discriminatory conduct are, by the preponderance of the evidence, pretextual. Although neither the seniority system nor the Arbitral decision required the discriminatory result which has obtained, to the extent that the injuries sustained by these plaintiffs may be attributed to defendant union's *de facto* seniority system at Square Deal, that system was not *bona fide* within the meaning of § 703(h), 42 U.S.C. § 2000e–2(h) or Elliott-Larsen's comparable clause, M.C.L.A. § 37.2211. See *Taylor v. Mueller*, 660 F.2d 1116 (6th Cir.1981). *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *EEOC v. Ball, supra; James v. Stockham Valve, supra,* and *Terrell v. United States Pipe and Foundry,* 644 F.2d 1112 (5th Cir.1981).

On the basis of the above-outlined findings of fact and conclusions of law, Judgment shall enter for plaintiffs against the defendant union.